**Reversed and Rendered and Majority and Dissenting Opinions filed August 9, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-00708-CV

---

## THE PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS, Appellant

### V.

## ZACHRY CONSTRUCTION CORPORATION, Appellee

---

### On Appeal from the 151st District Court
### Harris County, Texas
### Trial Court Cause No. 2006-72970

---

## MAJORITY OPINION

Zachry Construction Corporation (Zachry) sued the Port of Houston Authority of Harris County, Texas (the Port) for breach of contract arising from the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract. Following a three-month jury trial, the trial court entered a final judgment, awarding Zachry damages in the amount $19,992,697, plus pre- and post-judgment interest. The Port appeals the final judgment in eleven issues. Zachry also brings three issue on cross-appeal. We reverse and render.

## I. BACKGROUND

In 2003, the Port solicited bids to construct a wharf at the Bayport Ship Channel. The wharf consisted of five sections, each approximately 330 feet in length. Zachry's bid proposed building the wharf "in the dry" by using a U-shaped, frozen earthen wall to seal out water from Galveston Bay from the construction site. Zachry proposed to freeze the wall by sinking 100-foot pipes into the wall and circulating chilled brine through the pipes. Then, Zachry would install drilled shafts into the ground, pour a concrete deck on top of the drilled shafts and dirt using the ground as the bottom of the concrete form, excavate the dirt under the deck, and place revetment to stabilize the slope. After completing the wharf, Zachry would breach the freeze wall, flooding the area, and remove the remainder of the freeze wall so that ships would be able to dock at the wharf and unload their cargo.

An advantage of working "in the dry" instead of "in the wet" is that fewer "NOx" emission credits would be consumed. The Port accepted Zachry's bid because of the environmental benefits of using the freeze wall. On June 1, 2004, Zachry entered into the Bayport Phase 1A Wharf and Dredging Contract with the Port for the construction of a 1,660-foot wharf. The Port had concerns about the possible impact of the frozen soil on adjacent structures but provided in the contract that Zachry would control the means and methods. Zachry hired RKK-SoilFreeze Technologies, which, in turn, hired Dan Mageau of GeoEngineers, a geotechnical engineer, to design the freeze wall.

The contract also provided a strict timeline. Specifically, Zachry was to complete construction of the wharf by June 1, 2006. Zachry was also to meet an interim deadline of February 1, 2006—Milestone A—by which a portion of the wharf would be sufficiently complete to allow delivery of large ship-to-shore cranes that were to be shipped from China. The contract also provided that Zachry's sole remedy for any delay on the project was an extension of time.

In March 2005, the Port decided to extend the original wharf Zachry was constructing by 332 feet. Zachry submitted price quotes for the wharf extension on April 13, May 18, and July 11. The Port and Zachry executed Change Order 4 for the wharf extension on September 27, 2005. Change Order 4 extended the dates for Milestone A to February 15, 2006, and final completion to July 15, 2006.

From Zachry's perspective, Change Order 4 incorporated the April 13 proposal as further modified by the May 18 and July 11 proposals. So, Zachry had Mageau design a frozen cutoff wall (frozen COW), a perpendicular wall to the main freeze wall, to split the project into two phases: a west side including Area A, and an east side. Zachry sent that September 9, 2005 frozen COW design to the Port for "review," not "approval." Zachry believed it had the right to use the frozen cutoff wall and to do so with "uninterrupted work process."

From the Port's perspective, Zachry's September 9, 2005 frozen cutoff wall design was subject to a contractual technical specification that provided the Port with the right to respond. Because the contract specifically provided the Port a right to respond with a "revise and resubmit" (R&R), and because the Port had serious concerns about the design, that is precisely what it did. The Port provided its R&R response that (1) noted preliminary indications that the design may have an indeterminate effect on up to 14 shafts, (2) directed Zachry either to "present [an] alternative cutoff wall design" or to "present the Port of Houston with an alternate means of mitigating risk" to the shafts, and (3) allowed Zachry to use the frozen COW design if the shafts were protected.

Ultimately, in late November 2005, Zachry abandoned the frozen COW and switched to an "in the wet" scenario. The Port urges the course was Zachry's voluntary change in recognition that the freeze wall was "killing the schedule." Zachry urges that it was due to the Port's rejection of the frozen COW (Zachry's means and methods) and unwillingness to depart from the contract deadlines.

3

In May 2006, the Port notified Zachry that, due to Zachry's delay, the Port would begin withholding liquidated damages from payments on Zachry's monthly invoices. After withholding $2.36 million in liquidated damages, the Port voluntarily stopped withholding liquidated damages.

In late 2006, Zachry sued the Port for breach of contract, i.e., the R&R response, by failing to comply with Change Order 4 and section 5.10 of the contract, for the difference between the cost that Zachry would have incurred had it been allowed to complete the wharf "in the dry," i.e., using the frozen cutoff wall, and the actual cost Zachry incurred in completing the wharf "in the wet," i.e., without the frozen cutoff wall. Zachry also sued the Port for withholding liquidated damages for delays in the amount of $2.36 million, and for the Port's withholding of $600,000 as a purported offset for alleged defective dredging under Change Order 1. The Port filed a counterclaim for attorney's fees under section 3.10 of the contract, which provides that Zachry is liable for the Port's attorney's fees if Zachry brings a "claim" against the Port and "does not prevail with respect to such claim." Over two years after suing the Port, Zachry declared the wharf complete on January 26, 2009.

After a three-month trial, the case was submitted to the jury. The jury found that the Port had breached the contract by failing to comply with Change Order 4 and section 5.10, and found compensatory damages in the amount of $18,602,697 for the Port's breach of the contract. These damages represented Zachry's increased costs for switching to working in the "wet." The jury found that 58.13% of those damages were for delay or hindrance.

The jury did not find that the Port failed to comply with the contract by withholding $600,000 from the Port's payment on the amounts invoiced by Zachry for defective dredging.

4

The trial court instructed the jury that the Port had failed to comply with the contract by failing to pay Zachry $2.36 million withheld as liquidated damages. Thus, the jury needed only to determine whether the Port was entitled to offset; the jury found for the Port on the offset defense in the amount of $970,000 for Zachry's defective work on the Wharf fenders.

The jury found reasonable attorney's fees for the Port with respect to Zachry's claim relating to Change Order 4 and/or section 5.10: (1) $10,500,000 for trial; (2) $90,000 for appeal to the court of appeals; and (3) $22,500 for appeal to the Texas Supreme Court. The jury found reasonable attorney's fees for the Port as to Zachry's claim for withholding the $2.36 million as liquidated damages and the $600,000 for dredging: (1) $80,250 for trial; (2) $3,750 for appeal to the court of appeals; and (3) $1,250 for appeal to the Texas Supreme Court.

In its final judgment, the trial court awarded Zachry damages in the amount of $19,992,697—$18,602,697 plus $2.36 million in liquidated damages, less the $970,000 offset for the defective fenders, pre-judgment interest in the amount of $3,451,022.40, post-judgment interest on the total sum award of $23,443,719, and taxable costs. The trial court did not award the $600,000 withheld for defective dredging that the jury refused to award to Zachry. The trial court did not award attorney's fees to the Port.

In this appeal, the Port claims that the evidence is legally and factually insufficient to support the jury's findings on breach, causation, and damages; governmental immunity bars Zachry's claim for R&R damages; the no-damages-for-delay clause bars Zachry's delay damages; Zachry's failure to obtain a change order bars its recovery of R&R damages; Zachry's failure to provide written notice of a breach bars its R&R damages; governmental immunity bars Zachry's "pass-through" claim damages incurred by its subcontractor; the trial court abused its discretion by excluding evidence of the Port's harms and losses; the Port's failure to comply with the contract by withholding liquidated

damages was excused by release, as a matter of law; the trial court erred by instructing the jury on apparent authority; and the Port is entitled to attorney's fees.

In its cross-appeal, Zachry claims it is entitled to judgment, as a matter of law, for the $600,000 the Port withheld for defective dredging; the evidence is legally and factually insufficient to support to support the jury's findings that the Port did not fail to comply with the contract with respect to the fenders; and the evidence is factually insufficient to support the jury's findings on the amount of the Port's attorney's fees.

## II. ANALYSIS

### A. No-Damages-for-Delay Clause

Because we find the Port's Issue 4A dispositive of the award of R&R damages, we address it first. In Issue 4A, the Port contends that section 5.07's no-damages-for-delay clause bars Zachry's R&R damages. Specifically, the Port complains that the trial court erred by applying a common-law, tort-like "exception" to the contract's no-damages-for-delay clause. Section 5.07—the contract's no-damages-for-delay clause—provides:

> The Contractor shall receive no financial compensation for delay or hindrance of the Work. In no event shall the Port Authority be liable to the Contactor or any Subcontractor or Supplier, any other person or any surety for or any employee or agent of any of them, for any damages arising out of or associated with any delay or hindrance to the Work, regardless of the source of the delay or hindrance, including events of Force Majeure, AND EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY. The Contractor's sole remedy in any such case shall be an extension of time.

Question No. 3 asked the jury: "What sum of money, if any, if paid now in cash, would fairly compensate Zachry for its damages, if any, that resulted from the Port's failure to comply?" Relevant to this issue, the trial court instructed the jury that the contract's no-damages-for-delay provision precluded Zachry's R&R damages for delay

or hindrance unless the jury found that such damages resulted from the Port's "arbitrary and capricious conduct, active interference, bad faith and/or fraud."[1]  The jury found R&R damages in the amount of $18,602,697.

Question No. 4 asked the jury: "What percentage of the damages that you found in your answer to Question No. 3 was for delay or hindrance damages?"  The jury found 58.13% of Zachry's R&R damages resulted from delay or hindrance.  However, in an agreed motion, the Port and Zachry asked the trial court to disregard the jury's finding that 58.13% of such damages were the result of delay or hindrance because such finding was not supported by legally and factually evidence and, instead, asked the trial court to find that the evidence conclusively established, as a matter of law, that the answer to Question No. 4 is 100%.  The trial court entered an agreed order disregarding the jury's answer of 58.13% to Question No. 4 and found that it was conclusively established, as a matter of law, that the answer to Question No. 4 is 100%.

Our primary concern when we construe a written contract is to ascertain the parties' true intent as expressed in the contract.  *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011) (per curiam) (orig. proceeding); *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011).  "We must examine and consider the entire writing 'in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'"  *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam) (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)).  "We begin this analysis with the contract's express language."  *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).  The construction of an unambiguous contract is a question of law for the court, which we consider under a de

---

[1] In Question No. 3, the trial court instructed the jury as follows with respect to section 5.07:

> You are instructed that § 5.07 of the Contract precludes Zachry from recovering delay or hindrance damages, if any, unless you find that the delay or hindrance damages, if any, resulted from a delay or hindrance that was the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud.

novo standard of review. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *see also Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 214 (Tex. 2011) (op. on reh'g) ("Where an ambiguity has not been raised by the parties, the interpretation of a contract is a question of law.").

Zachary alleged that it suffered delay or hindrance damages on the project attributable to conduct by the Port, and the jury agreed. We have long recognized that "[i]n the absence of provision to the contrary, a contractor . . . is entitled to recover damages from a contractee . . . for losses due to delay and hindrance of work if it proves (1) that its work was delayed or hindered, (2) that it suffered damages because of the delay or hindrance, and (3) that the contractee was responsible for the act or omission which caused the delay or hindrance." *City of Houston v. R.F. Ball Constr. Co.*, 570 S.W.2d 75, 77 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.) (citing *Anderson Dev. Corp. v. Coastal State Crude Gathering Co.*, 543 S.W.2d 402 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.)).

The Port of Houston alleged that section 5.07 is a "provision to the contrary." The trial court rejected the Port's construction of section 5.07 as a blanket prohibition of delay damages. Instead, through its instruction in Question No. 3, the trial court determined, as a matter of law, that the Port could not enforce section 5.07 to preclude delay or hindrance damages resulting from any action by the Port that constituted arbitrary and capricious conduct, active interference, bad faith, or fraud.

Inasmuch as the delay damages constitute 100% of the damages awarded, a threshold question this court must resolve on appeal is whether the damage award is tainted because the trial court misinterpreted the contract and engrafted common-law exceptions onto the contractual no-damages-for-delay provision.

Generally, courts of many other jurisdictions give only a "restrained approval" of no-damages-for-delay provisions because of their harshness. *See* Maurice T. Brunner,

Annotation, *Validity and Constructions of "No Damage Clause" with Respect to Delay in Building or Construction Contract*, 74 A.L.R. 3d 187, 201 (1976). Those courts, again generally, construe the provisions strictly against the owner/drafter. *Id.* It is this strict construction that formed the genesis for common-law exceptions to the no-damages-for-delay clause.

It is undisputed that the Texas Supreme Court has not resolved whether Texas recognizes these exceptions. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 387–88 (Tex. 1997) ("Assuming that these . . . exceptions preclude the enforcement of no-damages-for-delay clauses, these exceptions have not been established in this case."). However, this court is not facing the application of common-law exceptions to a no-damages-for-delay clause for the first time. *See R.F. Ball Constr. Co.*, 570 S.W.2d at 77–78. Because the parties dispute the application of our precedent,[2] we explore it in depth.

In *R.F. Ball*, the City of Houston appealed a judgment in favor of its contractor arising from the construction of portions of the Houston Intercontinental Airport. *Id.* at 76. Ball was scheduled to complete the project on April 30, 1967, but did not do so until June 9, 1969. During the project, Ball faced "several hundred 'Change Items' and between eight hundred and nine hundred 'Clarifications.'" *Id.* The City paid direct costs associated with these changes, but did not pay indirect or impact costs associated with the changes. *Id.* The types of indirect costs included disruption to the project and "general hindrance of efficient work which inevitably resulted from the changes." *Id.*

After a two-month trial, the jury awarded substantial damages to Ball and specifically found *inter alia* that (1) the number of changes was greater than foreseen by the parties; (2) the unforeseen changes caused Ball's delay; and (3) such delay was not foreseen when the parties entered into the contract. *Id.*

---

[2] The Port states that "[t]his Court did not hold in *R.F. Ball* that Texas recognizes common law 'exceptions.'" On the other hand, citing *R.F. Ball*, among others, Zachry states that "Texas courts have repeatedly recognized and applied the [no-damages-for-delay] exceptions."

Thus, on appeal, this court faced these jury findings and a no-damages-for-delay clause that provided, in pertinent part:

> The Contractor shall receive no compensation for delays or hindrances to the work, except when direct and unavoidable extra cost to the Contractor is caused by the failure of the City to provide information or material, if any, which is to be furnished by the City. . . .  If delay is caused by specific orders given by the Engineers to stop work, or by the performance of extra work, or by the failure of the City to provide material or necessary instructions for carrying on the work, then such delay will entitle the Contractor to an equivalent extension of time . . . .

*Id.* at 77.

As a starting point, and citing to other jurisdictions, this court acknowledged that "one of the exceptions to the application of a [no-damages-for-delay] provision is that a delay which was not intended or contemplated by the parties to be within the purview of the provision is not governed by it." *Id.* (citing *Ace Stone, Inc. v. Twp. of Wayne*, 47 N.J. 431, 435 (1966); *W. Eng'rs, Inc. v. State Rd. Comm'n*, 20 Utah 2d 294, 296 (1968)). Referring again to other jurisdictions, we also noted three additional generally recognized exceptions to enforcement of no-damages-for-delay clauses.[3]

With this background, we examined the intent of the parties arising from the specific language of the contract.  Significantly, we specifically rejected Ball's line of cases that held that "if the delays or their cause were beyond the contemplation of the parties, then the [no-damages-for-delay] clause does not apply."  *Id.* at 78 n.2 ("We disagree with such cases since they preclude operation of the clause in situations where the character of the delay was unforeseen[,] the precise sort of delays the clause is

---

[3] The additional exceptions we mentioned are: (1) delay resulting from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (2) delay that has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; and (3) delay not within the specifically enumerated delays to which the no-damages-for-delay clause applies. *R.F. Ball Constr. Co.*, 570 S.W.2d at 77 n.1 (citing *W. Eng'rs, Inc.*, 20 Utah 2d at 296).

designed to cover."). Ball obtained specific jury findings that the delay it occasioned fell directly within the common-law exception upon which it relied. *Id.* at 77–78. Nonetheless, we determined that, because the no-damages-for-delay clause was unambiguous and did not limit its application to foreseen delays, Ball could not establish a right to compensation for the indirect costs of the delay. *Id*. at 78.

Finally, we specifically addressed the policy underlying some courts' rejection or restriction of no-damages-for-delay clauses: such provisions are very harsh. *Id*. Nevertheless, relying explicitly on the "instructive" language of the United States Supreme Court, we explained:

> "Men who take $1,000,000 contracts for government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work."

*Id*. (quoting *Wells Bros. Co. v. United States*, 254 U.S. 83, 87 (1920)).

Thus, in *R.F. Ball,* we noted that the common-law exceptions to no-damages-for-delay provisions are "generally recognized" and, further, we analyzed one of the exceptions—that the "delay which was not intended or contemplated by the parties to be within the purview of the provision." *Id*. at 77. However, we did not apply the exception because the contractor "ha[d] not established that the [no-damages-for-delay] clause was not intended to apply to unforeseen delays and hindrances and that it was only intended to apply to foreseeable ones." *Id*. at 78.

Here, the exceptions applied by the trial court addressed: "delay or hindrance that was the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud." Under *R.F. Ball*, then, we must determine whether Zachary established that the no-damages-for-delay clause at issue was

11

not intended to apply to delay or hindrance that was the result of the Port's actions. The plain language of the pertinent portion of the provision is as follows: "arising out of or associated with any delay or hindrance to the Work, regardless of the source of the delay or hindrance including events of Force Majeure, AND EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY." Thus, the parties' agreement states there are no damages for delay "regardless of the source."

Further, though the parties had already stated that the source of the delay was immaterial, they gave emphasis to their intent that delay due even in part to conduct by the Port was something they were specifically contemplating. And, as if specific mention might be insufficient, the parties typed the matters regarding conduct by the Port in all capital letters, which set it apart from the remainder of the paragraph. Finally, to give utmost emphasis, the parties described three categories of fault: (1) negligence, (2) breach of contract; or (3) other fault.

We know that the delay or hindrance damages were caused, at least in part, by breach of contract. By its response to Question Nos. 1 and 2, the jury determined that the Port breached the contract—both Change Order 4 and section 5.10 of the contract. The jury answered Question No. 3 by finding damages "that resulted from" the breach in the amount of $18,602,697. By the parties' agreement regarding Question No. 4, the evidence conclusively established that 100% of those damages are delay or hindrance damages. Thus, 100% of the delay or hindrance suffered by Zachry resulted from the conduct of the Port, that is, breach of contract. In accord with *R.F. Ball*, we conclude that Zachry has failed to establish that the no-damages-for-delay clause was not intended to apply to the Port's breach of contract.

The jury was not asked to make a specific finding on whether the Port's conduct "constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud."

12

However, we conclude that even a specific jury finding would not interfere with the application of the no-damages-for-delay clause in this case. By the parties' emphasis on "other fault" to the specific exclusion of "negligence," the parties have communicated their intent that Port conduct that rises above mere negligence or is a departure from the standard of care does not preclude enforcement of the no-damages-for-delay clause. Again, in keeping with *R.F. Ball*, we conclude that Zachry has failed to establish that the no-damages-for-delay clause was not intended to apply to Port conduct including, arbitrary and capricious conduct, active interference, bad faith, or fraud.

As harsh as this result seems, Texas law respects the objective intent of the parties where contract provisions show that the parties contemplated delay when entering into the contract. *See United States ex rel. Straus Sys., Inc. v. Associated Indem. Co.*, 969 F.2d 83, 85 (5th Cir. 1992) (citing *R.F. Ball Constr. Co.*, 570 S.W.2d at 77). Here, the parties clearly contemplated that delay, even due to the Port's conduct, was a possibility and negotiated accordingly. Moreover, parties to a contract might foresee or consider the possibility of delay and contractually provide for a remedy to be applied upon such occurrence. *Id.* (citing *R.F. Ball Constr. Co.*, 570 S.W.2d at 77). Here, the parties did just that by agreeing that, in case of delay, Zachry's "sole remedy in any such case shall be an extension of time." We need not go so far as to hold, as some courts of other jurisdictions do, that because the parties provided a remedy for delay, such remedy is the exclusive remedy. *See id.* (noting courts that hold a provision in the contract for an extension of time in a case of delay amounts to an exclusive remedy, precluding recovery of damages from the contractor).

"[T]he parties are free to contract as they see fit, as long as their agreement does not contravene public policy." *Tex. State Bd. of Med. Examiners v. Birenbaum*, 891 S.W.2d 333, 336 (Tex. App.—Austin 1995, writ denied) (citing *Scoville v. SpringPark Homeowner's Ass'n, Inc.*, 784 S.W.2d 498, 502 (Tex. App.—Dallas 1990 writ denied)). Courts do not rewrite contracts to insert provisions parties could have included or imply

13

restraints for which they have not bargained. *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996); *see also Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("But we may neither rewrite the parties' contract nor add to its language."). Instead, "[p]arties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract." *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 867 (Tex. App.—Tyler 2010, pet. denied) (citing *Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.—San Antonio 2001, pet. denied)). Specifically, "[the parties] are entitled to select what terms and provisions to include in a contract before executing it. And, in so choosing, each is entitled to rely upon the words selected to demarcate their respective obligations and rights. In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose." *Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 407 (Tex. App.—Amarillo 2003, pet. denied) (citing *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.)) (emphasis in original).

Zachry argues that if we do not apply the common-law exceptions to the contract's no-damages-for-delay clause, then the contract would be unbreachable and illusory. Zachry asserts, for example, that the Port could force Zachry to switch its means and methods and thereby cause serious delays in Zachry's performance. Zachry also avers that the Port could create a delay that lasts in perpetuity and then grant Zachry an extension of time that lasts in perpetuity, thereby breaching the contract while leaving Zachry with no remedy. However, the parties are free to negotiate and agree upon the conditions under which (1) the contractor will recover damages for delay, and (2) another remedy is available to the contractor for any such delay. In June 2004, Zachry unambiguously agreed that it would perform the contract without the benefit of delay damages, even if the delay was caused by the Port's breach of contract, negligence, or other fault. Zachry faced significant delays; delays it alleged—and the jury agreed—were caused by the Port's breach of contract. In November 2005, Zachry proceeded with

14

construction "in the wet," knowing the contract afforded no damages for delay. We cannot rewrite the provision without depriving the Port of the benefit of the bargain the parties reached in June 2004.

Therefore, we conclude that the no-damages-for-delay clause in the parties' contract precludes Zachry's recovery of damages for its R&R claim. We sustain Issue 4A.[4]

## B. Liquidated Damages

By Issue 9A, the Port also seeks reversal of the judgment for liquidated damages. The Port began withholding liquidated damages of $20,000 per day for Zachry's failure to meet Milestone A and the Wharf's final completion pursuant to sections 5.05 and 5.06 of the contract.[5] The trial court determined that the Port's withholding liquidated damages constituted a failure to comply with the contract. The Port does not appeal that ruling. Rather, the Port argues that any failure to comply with the contract by withholding liquidated damages was excused because Zachry released such claims as a matter of law.

The trial court charged the jury that the Port had failed to comply with the contract by withholding $2.36 million in liquidated damages. The trial court also charged the jury in Question No. 12 that the failure to comply would be excused to the extent of any dollar

---

[4] In Issue 4B, the Port further asserts that the evidence is legally and factually insufficient to support the jury's finding of any common law "exceptions" included in the court's charge that could be recognized under Texas law. However, we need not address those arguments in light of our disposition of Issue 4A.

[5] Section 5.05 is entitled "Time of Completion and Liquidated Damages," while section 5.06 is entitled "Actual Damages in Lieu of Liquidated Damages." The Port does not appear to complain about the trial court's invalidation of sections 5.05 and 5.06. Zachry points out that the Port does not appeal the directed verdict that the Port breached the contract by failing to pay Zachry $2.36 million based on an invalid liquidated damages clause. In its October 5, 2009 order, the trial court held that section 5.06—the liquidated damages provision—is an unenforceable penalty because it does not make clear that the liquidated damages are in lieu of other damages.

amounts as to which Zachry had released its claim for withholding liquidated damages.[6] Specifically, the trial court instructed the jury to determine "the meaning" of the "Affidavit and Partial Release of Lien for Zachry Construction Corporation" pertaining to Payment Estimate Nos. 21–31 in the context of whether the "[f]ailure to comply by the Port is excused" by the doctrine of release. The jury answered "No." Thus, in order to prevail here, the Port must conclusively establish that Zachry released its claim for sums withheld as liquidated damages.

Section 6 of the contract governs the parties' rights and responsibilities regarding payments on the agreement. Section 6.01 provides the Contractor's obligation to create a "Schedule of Costs," which includes the unit-price basis for all of the various items of work that "shall be the basis for the preparation of and submission of monthly estimates."

The parties' payment exhibits confirm this procedure for payment. Zachry submitted its monthly invoice package, which included a "Payment Estimate - Contract Performance." Each of Zachry's Payment Estimate forms identified items of work completed during the period; represented the percentage of the unit that was complete; and requested payment for the work completed that month. By item 12, each Payment Estimate form was "presented for payment" by a representative of Zachry. By item 13, the construction manager verified the completion status claimed for the period at issue and approved the request for payment. Item 14 set out categories of deductions—A through N—for items such as prior payments, contractual retainage, and "other deductions." Items 14(C) and 14(M) are "previous liquidated damages" and "liquidated damages this period."

---

[6] The trial court instructed the jury in Question No. 12 regarding excuse as to release:

You may also find excuse if you find, by a preponderance of the evidence[,] that Zachry released its claim for the failure to comply.

The court also instructed the jury in Question No. 12 regarding excuse as to offset and/or withholding regarding the fenders. The jury's finding that the Port is excused for the withholding to the extent of $970,000 for the fenders is addressed in Zachry's cross-appeal.

16

On May 10, 2006, the Port faxed a letter to Zachry stating that the Port was (1) "process[ing] [Zachry's] March 2006 . . . invoice" and (2) deducting, from payment on that invoice, "[l]iquidated damages total[ing] $820,000, based on 41 calendar days from February 16 through March 28, 2006 at $20,000 per calendar day." Zachry's March 2006 invoice corresponded to Zachry's Payment Estimate No. 23. By that Payment Estimate, Zachry sought a total payment of $1,885,807.26. The Port withheld $820,000 in liquidated damages from payment on Zachry's Payment Estimate No. 23.

Nevertheless, on May 17, 2006, Zachry signed an Affidavit and Partial Release of Lien for Zachry Construction Corporation as follows:

> ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number Twenty-three (23) and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number Twenty-three (23).

For the period February/March, 2006 through November, 2006, the Port withheld a total of $2.205 million in liquidated damages. In connection with each of these Payment Estimate - Contract Performance forms, Zachry executed an "Affidavit and Partial Relase of Lien for Zachry Construction Corporation." The chart that follows depicts the Payment Estimate number, the period covered, the total liquidated damages withheld, and the date of the Affidavit and Partial Release of Lien:

| Payment Estimate No.__[7] | Period Covered | Liquidated Damages Withheld | Affidavit Date |
|---|---|---|---|
| 21 | 1/06 | No | 3/27/06 |
| 22 | 2/06 | No | 4/14/06 |

---

[7] The Payment Estimate numbers referenced are Zachry's. Subsequent Partial Release and Indemnity documents reflect that the PHA estimate numbers are not the "Payment Estimate" numbers referenced in each release.

| 23 | 3/06 | $820,000 | 5/17/06 |
|---|---|---|---|
| 24 | 4/06 | $520,000 | 6/7/06 |
| 25 | 5/06 | $220,000 | 7/24/06 |
| 26 | 6/06 | No | 8/21/06 |
| 27 | 7/06 | $35,000 | 9/22/06 |
| 28 | 8/06 | $155,000 | 10/23/06 |
| 29 | 9/06 | $150,000 | 11/20/06 |
| 30 | 10/06 | $155,000 | 12/15/06 |
| 31 | 11/06 | $150,000 | 1/31/07 |

The Port argues that, by signing the May 17, 2006 release, as well as releases covering invoices through November 2006 (Payment Estimate Nos. 23–31), Zachry, as a matter of law, released its claim to $2.205 million in liquidated damages, which the Port withheld cumulatively from payment on those invoices/Payment Estimates. Therefore, according to the Port, any failure to comply with the contract by withholding $2.36 million in liquidated damages is excused to the extent of $2.205 million. Zachry counters that each release, styled "Affidavit and Partial Release of Lien," unambiguously released nothing more than liens.

A release is a writing that provides that a duty or obligation owed to one party to the release is discharged immediately or upon the occurrence of a condition. *See Nat'l Union Fire Ins. Co. of Pittsburg, Pa. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 127 (Tex. App.—Houston [14th Dist.] 1997), *aff'd sub nom., Keck, Mahin & Cate v. Nat'l Fire Ins. Co of Pittsburg, Pa.*, 20 S.W.3d 692 (Tex. 2000). Releases are subject to the usual rules of contract construction. *Id.* As in other instances of contract construction, our primary concern is to ascertain the intent of the parties at the time of the execution of the alleged

release as expressed in the release. *See generally In re Serv. Corp. Int'l*, 355 S.W.3d at 661; *Epps*, 351 S.W.3d at 865.

To construe the release, we may examine evidence of the circumstances surrounding the negotiation and execution of the release. *See Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) (holding the proper rule is that "evidence of surrounding circumstances may be consulted" and, "[i]f in light of the surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing"). We may also consider "the deletions made by the parties" in the course of drafting the instrument at issue. *See Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 664 (Tex. 1964). Finally, we may consider the title of the document, but such is not dispositive. *Enter. Leasing Co. of Houston v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (per curiam) ("Although we recognize that in certain cases, courts may consider the title of a contract provision or section to interpret a contract, 'the greater weight must be given to the operative contractual clauses of the agreement.'" (quoting *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 600 (Tex. 1959))).[8]

For a release to be effective, it must "mention" the claim to be released. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991). However, the release need not specifically describe a particular cause of action. *See Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434–35 (Tex. 1997) (per curiam).

We begin with the plain language of the release at issue. Its title is "Affidavit and Partial Release of Lien for Zachry Construction Corporation." It states that Zachry "has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs" in the respective Payment Estimate. The body of the document

---

[8] Zachry points out that the word "release" appears only once—in the title, immediately followed by "of lien," and argues that title may be considered in determining intent.

contains neither the word "release" nor the word "lien."[9]  Yet, the plain language of the sworn statement unambiguously avers that the Port has paid "all sums owing" on the Payment Estimate at issue and that Zachry has "no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs" in the Payment Estimate at issue.  Zachry's proposed interpretation of these words to mean "no liens" rather than "no further claims" is not a reasonable interpretation of the language.

The parties also rely on surrounding circumstances to construe the release. Specifically, they compare the language of the release at issue to both the prior and subsequent release forms.  Even if we accept the invitation to look beyond the four corners of the affidavit at issue, these surrounding circumstances do not support Zachry's proposed interpretation of the language at issue.

Both the prior and subsequent versions are also entitled "Affidavit and Partial Release of Lien for Zachry Construction Corporation."  However, the text of the original or first version of the release states:

> ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number [ ] and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number [ ].

> In consideration for such partial payment, ZCC . . . does hereby waive, release, and relinquish its rights to and discharge, release and acquit Port of Houston Authority . . . from any and all causes of action, claims,

[9] That the body of the provision does not contain the word "release" or "lien" or traditional boilerplate associated with releases or liens is not dispositive of our analysis.  Even where the parties' agreement does not contain the term "release," "the intent of the parties controls, and the legal effect of the instrument may be a general release." *Knutson v. Morton Foods, Inc.*, 603 S.W.2d 805, 811 (Tex. 1980) (Denton, J., concurring) (citing W. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 49 at 303 (4th ed. 1971)).  Zachry provides and we find no authority for the proposition that an agreement cannot legally release a claim unless it uses the word "release."  In fact, if Zachry were correct, then an agreement to "voluntarily relinquish a right known to me" could not operate as a waiver because the magic word is not uttered.  We believe such an artificial approach to construing agreements between parties finds no support in Texas law and would be contrary to the primary purpose of contract interpretation—determining the parties' intent.

demand, debts, liabilities, expenses or costs of any kind and every character and nature whatsoever, including but not limited to any lien claims or rights, whether known or unknown, contingent or fixed, either in or arising out of the law of contracts, torts or property rights, whether arising under statutory law or common law, at law or in equity, with respect to the Work for which such partial payment is made. . . .

The third version of the release, used by the parties after the release at issue, states:

ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number [ ] and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number [ ].

In consideration for such partial payment, Zachry Construction Corporation, on its own behalf and on behalf of any other entity claiming by, through or under Zachry Construction Corporation, does hereby waive, release, and relinquish its rights to and discharge, release and acquit Port of Houston Authority from any and all causes of action, claims, demands, debts, liabilities, expenses or costs of any kind and every character and nature whatsoever with respect to the Work accruing or based on events occurring from the commencement of the Work through the date covered by Payment Estimate Number [ ], including by [sic] not limited to any lien claims or rights, whether known or unknown, contingent or fixed, either in or arising out of the law of contracts, tort or property rights, whether arising under statutory law or common law, at law or in equity, less and except only the Outstanding Claims and other matters indentified in this Partial Release and Indemnity.

Furthermore, there is pending litigation between the Port of Houston Authority and Zachry Construction Corporation under this contract, namely, the Phase 1A Wharf and Dredging Contract. This litigation is styled Cause No. 2006-72970, *Zachry Construction Corporation v. the Port of Houston Authority*, pending in the 151st Judicial District Court of Harris County, Texas (the "Lawsuit"). Each of Zachry Construction Corporation and the Port of Houston Authority agrees that Zachry Construction Corporation's execution of this Lien Release for pay Estimate No. [ ] does not in any way release or modify the parties' rights and obligations under the Phase 1A Wharf and Dredging Contract or constitute a release of any claim or claims that the parties may present in the Lawsuit with respect to Phase 1A Wharf and Dredging Contract.

21

Thus, the first form included, in addition to the release language at issue here, broad, general release language that purported to cover "all causes of action" including legal or equitable, common-law or statutory claims arising in contract, tort, or property rights. The parties deleted this general release language from the second version of the release at issue here. And, when litigation ensued, the parties revised the form again to reinsert general release language, but to specifically except the claims in this suit. Still, the third version contained the release language at issue here. Thus, the "deletion" gives no support to Zachry's argument that the release was transformed into a mere release of lien.[10]

Further, the parties point to section 6.07 of the contract to guide the interpretation of the release. Section 6.07 required Zachry to release any further "claim[s] for payment" as to Zachry's prior invoice/Payment Estimate.[11] It further provides, in pertinent part,

_____

[10] Zachry stresses that "the second version **deleted** the general release language." (emphasis in original). Zachry contends that "[t]he deletion of the general release language in the second lien release version—the version on which the Port relies—shows the second version was not a general release." *Id.* at 70. Zachry's reliance upon *Houston Pipe Line Co.*, 374 S.W.2d at 664, and *Hall v. Lone Star Gas Co.*, 954 S.W.2d 174, 176 (Tex. App.—Austin 1997, pet. denied), for that argument blurs an important distinction between deletions and omissions in this context. To be precise, the language upon which Zachry focuses was not deleted in the sense of appearing on a preprinted form and then being stricken through using an "x" or some other mark visible on the face of the document. *See, e.g., Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 466 (Tex. 2011); *Houston Pipe Line Co.*, 374 S.W.2d at 663; *Gibson v. Turner*, 294 S.W.2d 781, 782 (1956). The language upon which Zachry focuses was omitted from the operative version of the document but appeared in other versions. There is reason to question how much weight properly can be given to omitted language from other versions of the document in light of the parol evidence rule. *See, e.g., Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006) ("Evidence of prior policies is extrinsic evidence, and thus inadmissible unless the policy is ambiguous . . . . And while we have looked at a prior policy in deciding between reasonable constructions of a current one, we have never done so in lieu of construing the current one at all.")

[11] Section 6.07 of the contract states, in pertinent part:

As a condition precedent to the obligation of the Port Authority to make payment on any invoice, the Contractor shall supply the Port Authority with waivers and releases of liens (including without limitation all mechanics' and materialmens' liens and any other type of security interest), which waivers and releases shall be duly executed and acknowledged by the Contractor and each Subcontractor and Supplier expecting payment from [the] Contractor in respect of such invoice in order to assure an effective release of such liens to the maximum extent permitted by Applicable Law. The waivers and

22

that such waivers and releases of liens shall provide, "at a minimum, that all amounts due and payable to the Contractor and each such Subcontractor and Supplier, as of the date of such invoice . . . have been paid in full." Zachry relies on the "to the extent set out in the preceding sentence" language as an indication that the contract did not require it to release a *claim* that payment had not been made in full; just a release of any *lien* arising out of the failure to do so. The Port urges that the subject provision unambiguously released any further claim for payment for the work accomplished and billed on the relevant payment estimate and, thus, released any claim that there was no payment in full by virtue of a liquidated damages offset. Zachry argues that the subject provision unambiguously released nothing more than claims for payment to assure an effective release of liens. Once the parties eliminated the "general release language," Zachry insists it no longer released its breach of contract claim with each payment.

Zachry's construction of version two of the release is inconsistent with the surrounding circumstances. First, as mentioned, the only reference to "lien" is the heading of the affidavit. It cannot be limiting language, however, because it is the same heading for each of the three versions, including the first version that Zachry admits operated as a broad release of claims.[12] Second, section 6.07 does not provide a limiting circumstance. Although section 6.07 may not require Zachry to release anything more than liens arising from failure to make payment, even Zachry acknowledges that it released far more in connection with version one because version one mentions claims, including liens. Similarly, version two mentions claims, not liens, for the portion of the

---

releases of liens shall provide, at a minimum, that all amounts due and payable to the Contractor and each such Subcontractor and Supplier, as of the date of such invoice and as of the date of the last payment received by the Contractor and each such Subcontractor and Supplier have been paid in full and that the Contractor and each such Subcontractor and Supplier waives, releases and relinquishes any lien (including without limitation any mechanic's or materialman's lien), security interest and claim for payment to the extent set out the preceding sentence.

[12] A broad, general release releases every potential cause of action pertaining to the subject matter. *See Keck, Mahin & Cate*, 20 S.W.3d at 698.

23

Work completed and listed. As such, any limitation of section 6.07 is not a limitation on our construction of the release provision.

We conclude the provision is subject to one reasonable interpretation, that is: the provision at issue (version two) releases any further claim for payment for work accomplished and billed by the relevant payment estimate, which also operates to release any lien for that same work because payment is made in full. Because the general release language is omitted, the provision does not release:

- claims arising in tort;
- claims to adjudicate property rights;
- claims for any and all causes of action, claims, demand, debts, liabilities, expenses, or costs of any kind and every character and nature whatsoever; or
- *all* claims for breach of contract.

But, even without the general release language, the specific release language of version two releases claims for breach of contract predicated upon a failure to make payment for work accomplished, billed, and paid—in whole or in part—on a particular payment estimate.

Our dissenting colleague concludes that the Port has failed to establish release as a matter of law because the documents at issue are, at a minimum, ambiguous. Meticulously comparing the release documents to the Payment Estimates at issue, the dissent urges that the release leaves open the question of what document is referenced in each release. Such asserted ambiguity is not one argued by Zachry, however. Zachry does not urge that the releases do not match the payment estimates. Zachry does not urge that the term Payment Estimate is ambiguous in its reference to Zachry's payment estimates rather than the Port's. Zachry does not urge that the absence of evidence identifying a payment release seeking payment in the same quantity released defeats the release. To the contrary, Zachry urges that the *release is a release to the full extent of the payment estimates*; it simply urges that the release is a full release of lien, rather than a full release of payment.

24

Moreover, there is no ambiguity in "what exactly has been released" as the dissent suggests. The language of the release goes beyond saying Zachry has no further claims against PHA. The release says "[Zachry] has no further claims against PHA **for the portion of the Work completed and listed on the Schedule of Costs in Payment Number __.**" (emphasis added). It is undisputed on this record that the Port had already withheld all of the liquidated damages that it ever did withhold by the time Zachry signed the subject release in January 2007. Thus, it released any further claim for the work that had been completed and listed on the Schedule of Costs in Payment Estimate 31. Texas law requires identification of the claim to be released—not quantification.

In summary, we conclude that, when Zachry signed the "Affidavit and Partial Release of Lien," stating that the Port "has made partial payment to ZCC on all sums owing on Payment Estimate Number Thirty (30) and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number 30," Zachry unambiguously discharged or released the Port from any further duty or obligation to pay sums billed through Payment Estimate No. 29. *See Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 955 S.W.2d at 127. The "Affidavit and Partial Release of Lien" mentions the claims being released: "claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number 30." *See Victoria Bank & Trust Co.*, 811 S.W.2d at 938. As Payment Estimate No. 30 included offsets for liquidated damages in the sum of $2.205 million, Zachry has no further claims for payment arising from the work completed and listed on that Payment Estimate.

We conclude that if the Port failed to comply with the contract by withholding liquidated damages, such failure was excused, in part, as a matter of law by Zachry's release.[13] We sustain the Port's Issue 9A.

---

[13] The Port also raises the same release argument in response to Zachry's issue on cross-appeal regarding the $600,000 withheld for dredging. For the same reason we sustain the Port's Issue 9A, we

## C. $970,000 Offset for Defective Fenders

The Port claimed a right under section 6.05 of the contract to withhold or offset certain liquidated damage amounts because of alleged damages related to Wharf fenders. Question No. 12A asked the jury whether the Port's failure to comply with the contract by withholding $2.36 million in liquidated damages was excused, in whole or part, "by offset and/or withholding" for Zachry's failure to comply with the contract with respect to fender corrosion.[14] The jury found that the Port was entitled to withhold or offset for fender damage in the amount of $970,000. The trial court entered judgment on Zachry's R&R claim, but offset the $970,000 against Zachry's damage award.

By its Cross-Appeal Issue 2, Zachry contends that it is entitled to judgment rendered in its favor on the $970,000 because the evidence is legally and factually insufficient to support the jury's findings (1) that Zachry breached the contract in constructing the fenders, (2) that any breach caused the fenders' corrosion and the Port's damage, or (3) as to any amount of damages the Port suffered as a result. Although we agree that (a) the presentation of evidence on the fenders was brief and not emphasized with the jury; and (b) there is competing evidence on the subject, we disagree that that evidence is legally or factually insufficient.

---

overrule Zachry's Cross-Appeal Issue 1A and B, in which Zachry claims that it is entitled to judgment as a matter of law on the $600,000 withheld for dredging. The jury found in Question No. 9 that the Port did not fail to comply with the contract by withholding $600,000 for dredging. Zachry's claim to recover the $600,000 for dredging is barred by release as a matter of law, just the same as the $2.205 million in liquidated damages withheld from invoice payments addressed above.

[14] The trial court instructed the jury in Question No. 12 regarding excuse as to offset and/or withholding:

> You may find excuse if you find, by a preponderance of the evidence, that the Port is entitled to withhold for fenders under § 6.05 of the General Conditions of the Contract and/or that the Port is entitled to offset for fenders under § 6.17 of the General Conditions of the Contract.

> The Port is entitled to withhold and/or offset for fenders under these provisions if you find, by a preponderance of the evidence, that, with respect to the fenders, Zachry failed to comply with the Contract resulting in a loss to the Port.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively established the opposite of the vital fact. *Id.* at 810. To evaluate the factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

The Port's Bayport engineer Mark Vincent testified about the Wharf fenders, which had a life expectancy of 30 years but corroded within 90 days. He stated that the Port incurred damages in the approximate amount of $978,000 for "recoating" repairs. He also noted that the Port sent a warranty deficiency notice to Zachry on the fenders but Zachry refused to repair them.

The coating at issue is governed by Technical Specification Section 09950. The jury received evidence that (a) this specification requires Zachry to "apply 2-3 mils of the specified epoxy" coating; and (b) "[t]hickness tests conducted on the upper portion of the fenders ranged from 18 to 26 mils including the seal coat." From this evidence, the jury was entitled to infer that Zachry applied coating well above the 2–3 mils level specified by the contract. Thus, the evidence is legally sufficient to support the jury's finding that Zachry failed to comply with the contract and, specifically, Technical Specification Section 09950.

The jury also heard evidence that the purpose of the above technical specification on coating is "to obtain full continuity of the epoxy and total sealing of porosity." The fenders were to be sealed because a portion of each fender is installed under water. By his report,[15] admitted without objection, Stephen Pinney, an engineer hired by the Port to inspect the fenders, indicated that his personal inspection revealed that the three-foot portion of the fenders submerged "failed down to the bare steel" but that the portion of the fenders "above the splash zone" remained intact. Pinney stated that the most probable cause of the failure is:

- the seal coat applied to the metalizing was insufficiently thinned;
- because the seal coat was insufficiently thinned, it was not able to penetrate into the porous metalized aluminum substrate;
- because the seal coat did not penetrate, it remained on the surface;
- because the seal coat remained on the surface, the aluminum pores remained open;
- because the aluminum pores remained open, they filled with seawater;
- because the aluminum filled with seawater, it corroded.

This evidence is both legally and factually sufficient to support the jury's finding that Zachry's failure to comply with the contract specification regarding coating compromised the sealing of porosity and directly caused the fenders' corrosion.

Vincent also testified that the approximate cost to repair the fenders that corroded "as soon as they were put in the water" was $978,000. Zachry urges that this testimony is legally insufficient[16] because at no point does Vincent or any other witness provide an opinion that $970,000 is the "reasonable and necessary" cost to repair the fenders. The

---

[15] Zachry cites no case, and we find none, to support Zachry's suggestion that if documentary evidence is "not discussed by any witness" or "otherwise brought to the jury's attention," it may be discounted or disregarded on appellate review.

[16] Zachry also argues that, even if the damages evidence is sufficient, the court should reverse and remand for a new trial, as the trial court failed to instruct the jury that it could only award "reasonable and necessary" damages. We address these points together.

Port counters that the cost to repair the fenders need not be "reasonable and necessary" where, as here, the contract itself does not require that the loss be "reasonable and necessary."

We agree with the Port and conclude that the trial court did not err with regard to the jury charge. For this court to imply a requirement that the costs to repair be "reasonable and necessary" would be tantamount to modifying the contract. *See Aetna Cas. & Sur. Co. v. Marshall*, 699 S.W.2d 896, 902 (Tex. App.—Houston [1st Dist.] 1985), *aff'd*, 724 S.W.2d 770 (Tex. 1987); *see also Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 248 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Zachry's authority is inapposite as it pertains to interpreting an oral contract. *See Walker & Assocs. Surveying, Inc. v. Austin*, 301 S.W.3d 909, 919 (Tex. App.—Texarkana 2009, no pet.) (ascertaining the terms of an oral contract where there was "little or no agreement reached about the level of competence of the workers provided"). Therefore, the jury's determination of $970,000 as the cost to repair the fender is supported by Vincent's testimony about $978,000-worth of repairs.

We overrule Zachry's Cross-Appeal Issue 2 regarding the Wharf fender offset award.

### D. Attorney's Fees

In Issue 11, the Port argues that it is entitled to the attorney's fees found by the jury for the R&R and withholding claims because the Port is entitled to judgment on those claims.

Zachry brought multiple claims or theories of the Port's breach of the contract: the R&R claim, i.e., failure to comply with Change Order 4 and section 5.10 of the contract, and claims for withholding $2.36 million in liquidated damages and $600,000 for dredging. The jury determined that a "reasonable fee for necessary services of the Port's attorneys" on "Zachry's Claim Relating to Change Order 4 and/or § 5.10 of the Contract"

is $10,500,000 for trial; $90,000 for an appeal to the court of appeals; and $22,500 for an appeal to the Texas Supreme Court. The jury determined that a reasonable fee for "Zachry's Claim for Withholding the $2.36 million as liquidated damages and the $600,000 for dredging" is $80,250 for trial; $3,750 for an appeal to the court of appeals; and $1,250.00 for an appeal to the Texas Supreme Court.

Section 3.10 of the contract makes Zachry liable for the Port's attorney's fees if Zachry brings "a claim" and "does not prevail with respect to such claim."[17] We have determined that Zachry has not prevailed with respect to "Zachry's Claim Relating to Change Order 4 and/or § 5.10 of the Contract." We also have determined that Zachry has not prevailed with respect to "Zachry's Claim for Withholding the $2.36 million as liquidated damages and the $600,000 for dredging," i.e., we have sustained the Port's Issue 9A that the Port's withholding liquidated damages was excused by $2.205 million of the $2.36 million damages awarded, and we have overruled Zachry's Cross-Appeal Issue 2 on the Port's $970,000 offset of the sum awarded for liquidated damages. Having determined that Zachry did not prevail on the three claims or theories presented to the jury, we need not determine whether Zachry brought one or two or three claims.[18] We need only determine whether the sums awarded by the jury for the Port's reasonable and necessary attorney's fees are supported by factually sufficient evidence.

---

[17] Section 3.10 states:

> If Contractor brings any claim against the Port Authority and Contractor does not prevail with respect to such claim, Contractor shall be liable for all attorney's fees incurred by the Port Authority as a result of such claim.

[18] If the Port had succeeded on appeal on only the judgment for the R&R claim, Zachry claims that the Port would not be entitled to any attorney's fees on the R&R claim because Zachry would still have prevailed on its breach of contract claim. That is, Zachry argues that it brought one breach of contract claim, but different theories of breach: R&R damages and withholding damages. The Port contends that Zachry brought multiple claims, entitling the Port to the segregated attorney's fees on the R&R claim if a take-nothing judgment is rendered on the R&R claim, but not the withholding claims. However, because Zachry has not prevailed on any of its "claims" or "theories," we need not address these arguments.

By Cross-Appeal Issue 3, Zachry contends that in the event that Zachry does not prevail on any theory underlying its breach-of-contract claim, Zachry would still be entitled to a new trial on attorney's fees. In support of its claim for attorney's fees, the Port offered the testimony of its billing attorney, Karen White, and its designated attorney's fees expert, Dan Downey. Zachry claims that (1) the trial court erred by admitting the testimony of White because she was not designated as an attorney's fees expert; and (2) Downey's testimony is factually insufficient to support the jury's finding on the amount of the Port's attorney's fees.

We first address whether the trial court erred in admitting White's testimony. Prior to White's testifying, the trial court ruled that she could testify as a fact witness, but not as an expert because she had not been designated as an expert.[19] That is, White would not be allowed to testify as the reasonableness of the segregation of the attorney's fees. Zachry complains here that White did, in fact, provide expert testimony. The Port urges that Zachry waived any objection to White's testimony by failing to obtain a ruling.

During White's testimony, Zachry objected twice that White's testimony was drifting into expert opinions. The first occurred when White, after describing the document production process, stated "[w]e didn't feel that they had produced every document to us that they should have . . . ." Zachry "object[ed] at this point" because White was to be "a very limited fact witness, not an expert," and was being tendered as a witness for the "limited purpose of segregation. That is, to tell us exactly how the segregation of the fees was identified and determined." The trial court overruled the objection, stating that it would "let White testify about these subjects." White provided further testimony on the document-production process, including the huge volume of documents produced by each side and the process for reviewing those documents. We

---

[19] Specifically, the trial court ordered that White could "testify as a fact witness only and without reference to these billing records, period, the end. . . . And so no reference to the billing records and no opinions." In response to Zachry's counsel's clarification that White would "only testify as to the methodology by which this segregation and she [will] not be given [sic] any kind of an opinion as to the reasonableness of segregation. That would be Mr. Downey," the trial court responded, "Right."

find the trial court did not abuse its discretion in ruling that document-production testimony was not expert testimony.

The second objection occurred during White's response the question: "[W]hat was your role as a billing attorney?" White explained the process of inputting time and then stated that, "as billing attorney, then I review the bills to make sure that everything's properly chargeable to the client, that it's properly . . . ." Zachry's counsel objected, again complaining about the testimony in light of the trial court's expert-opinion ruling. The trial court agreed that when White "talks about whether a particular item was properly billable to the client," she is offering an opinion. Therefore, the Port agreed to "ask Ms. White not to add whether something was properly billable to the client." Thus, the trial court did not make a ruling adverse to Zachry or otherwise deny Zachry relief.[20]

We now address Zachry's complaint that the testimony of the Port's expert, Dan Downy, was not factually sufficient to support the jury's findings on attorney's fees.[21] Downey opined that the attorney's fees incurred by the Port were reasonable and necessary, and that the fees were properly segregated. The jury heard about the Port's process for compiling factual data on attorneys' services rendered. Port paralegal Holly Gray searched the computerized records with certain search terms and created a spreadsheet that included all of the hours and times for any entry that "had any of the terms in it." Gray provided that spreadsheet to Downey.

Downey identified the bases for his opinions as to the reasonableness and necessity of the Port's legal fees. In addition to the spreadsheet, Downey reviewed the pleading and discovery index and requested to see particular pleadings and motions "so

---

[20] Although Zachry mentions the Port's failure to disclose fee statements as a basis for excluding White's testimony, the trial court did not rule on this objection because the Port's attorney withdrew the pending question. Therefore, we do not address that argument.

[21] Downey testified that he had been a Harris County trial judge from 1988 to 1994, and had been a lawyer or judge in Texas for about 33 years. Downey further stated that he had not testified previously as an attorney's fees expert in any cases other than his own and that, as a trial judge, attorney's fees did not frequently come before him as a contested issue.

[he] could get a handle on what was involved." Downey then conducted separate interviews with individual attorneys involved in the case concerning "what their role was and how they set about performing that task." Downey "was trying to get a handle on how much work is involved in those tasks, to see if it makes sense and matches up with the time that they have logged for those tasks." Downey interviewed the attorneys more than once. Downey also interviewed the legal assistants. The jury saw several exhibits containing Downey's notes as well as compilations of fees by month and attorney.

Zachry's attorney's fees expert, William Junell, agreed that the lawsuit between Zachry and the Port amounted to an "all-out-war between the parties for . . . three years."[22] However, Junell disagreed with Downey's opinion on the reasonableness and necessity of the fees incurred by the Port.

Both Junell and Downey testified about the factors applicable to an attorney's fee award.[23] The jury heard that the Port's fees were two-and-a-half times more than Zachry's in October 2008. That "raised red flags in [Junell's] mind." Downey, however, explained that the primary difference related to the review of documents. Downey was satisfied that the work the Port lawyers performed in reviewing documents "was fair and reasonable and necessary."

---

[22] Junell testified that he had been practicing law for over 38 years and had served as an expert witness on attorney's fees approximately a dozen times.

[23] The factors are (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). This court considers those factors to be guidelines rather than elements of proof. *See Academy Corp. v. Interior Buildout & Turnkey Const., Inc.*, 21 S.W.3d 732, 742 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

The jury also heard Junell's criticism that Downey did not review any of the underlying bills for the 44,000 hours of attorney time for which the Port sought recovery.[24] Junell testified that "we do not have the required information that tells you what services were rendered by what lawyers on the occasion in case and at what rate for those services." But Downey explained that he favored individual interviews over the actual bills because he felt it was likely that the bills contained privileged information and would inadequately explain the activities of the attorneys that he needed to consider. He also explained that he had taken out certain aspects of Port fees that he did not consider appropriate.

Ultimately, through a thorough cross-examination of Downey, Zachry made the jury aware of the weaknesses in the Port's attorney's fee claim: the Port was seeking $15 million in attorney's fees to defend Zachry's $30 million claims; the Port had four separate law firms defending it; Downey had not documented what tasks were performed by each attorney; and Downey had not used actual bills to form his opinion even though that is the standard practice for attorney's fee witnesses, and though they would have provided some verification of the attorneys' representation of their time spent.

We conclude that the evidence is factually sufficient to support the fee award in this case, though the evidence would also have supported far less. The most significant concern about this award is the relationship between the fee awarded and the amount in controversy, particularly when compared to the fees incurred by Zachry. However, this court has previously determined, albeit on much smaller sums, that a fee award that was two times the amount in controversy was supported by legally and factually sufficient evidence. *See Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 209–10 (Tex. App.—Houston [14th Dist.] 2005, no pet.) The relationship between the

---

[24] Here, the Port urges that Zachry has waived its sufficiency issue because its complaints are "waived challenges to his methodology." However, Zachry urges a factual sufficiency challenge to fees, not a legal sufficiency challenge. The Port cites no case, and we find none, that holds that failure to challenge a fee expert's methodology waives a factual sufficiency complaint on appeal.

fee and the amount in controversy is merely a factor that we examine. *See USAA Cnty. Mut. Ins. Co. v. Cook*, 241 S.W.3d 93, 103 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Moreover, the testimony provides sufficient evidence to support this discrepancy. Downey's and White's testimony illustrated that the majority of the differential occurred in the area of discovery and, specifically, the pursuit and review of document production. White testified that rather than provide copies of responsive documents to the Port, Zachry asked the Port's attorneys "to come out to the site facility and review documents there." Thus, two Port attorneys went to an un-air conditioned, metal container facility "crammed full of boxes not organized in any manner." They pulled boxes outside of the container, one at a time, "and sat under a tree in May out at the wharf site and reviewed documents searching for things that might be responsive." While Junell testified about the volume of material reviewed by each side, he spoke of electronic documents; thus, the jury was free to believe that the method of document production played a role in the number of hours the Port attorneys needed to spend to accomplish the task. We conclude that the evidence is factually sufficient to support the jury's finding on attorney's fees.

We overrule Zachry's Cross-Appeal Issue 3.

### III. CONCLUSION

To summarize, we hold that the application of the no-damages-for-delay clause precludes Zachry's claim for delay or hindrance damages on its claim for damages on its R&R claim.

We further hold that Zachry released, as a matter of law, $2.205 million of its $2.36 million claim for the Port's withholding liquidated damages. We further hold that the evidence is legally and factually sufficient to support the jury's finding of the Port's offset of $970,000 for defective fenders. Because the amount of liquidated damages that Zachry released and the amount of offset the jury found for defective fenders is greater than the $2.36 million that Zachry sought for the Port's withholding of liquidated

damages, we hold that Zachry may not recover on its $2.36 million claim for withholding liquidated damages.

We further hold that the trial court did not err in failing to rule, as a matter of law, that the Port breached the contract by withholding $600,000 for dredging.

We further hold that the Port is entitled to recover attorney's fees as found by the jury with respect to Zachry's R&R claim as follows: (1) $10,500,000 for trial, (2) $90,000 for appeal to the court of appeals, and (3) $22,500 for appeal to the Texas Supreme Court; and with respect to Zachry's withholding claims as follows: (1) $80,250 for trial, (2) $3,750 for appeal to the court of appeals, and (3) $1,250 for appeal to the Texas Supreme Court.[25]

Thus, we reverse the judgment awarding Zachry $18,602,677 in damages on its R&R claim and $2.36 million in liquidated damages and render judgment that Zachry take nothing on those claims. We render judgment that the Port have and recover attorney's fees from Zachry with respect to the R&R claim as follows: (1) $10,500,000 for trial, (2) $90,000 for appeal to the court of appeals, and (3) $22,500 for appeal to the Texas Supreme Court; and with respect to the withholding claims: (1) $80,250 for trial, (2) $3,750 for appeal to the court of appeals, and (3) $1,250 for appeal to the Texas Supreme Court.

---

[25] Having sustained the Port's Issue 4A regarding Zachary's delay or hindrance damages purportedly sustained as a result of the Port's R&R response, and Issue 9A regarding the Port's withholding of liquidated damages, we need not address the Port's other issues. Further, as we do not reach the Port's Issue 3 asserting that sovereign immunity was not waived, we need not address the concern of *amicus curiae*, The Surety & Fidelity Association of America, regarding whether a local government entity is subject to the same measure of contractual damages as any other contracting party unless such damages fall within the express limitations of Section 271.153(b) of the Texas Local Government Code.

Accordingly, we render judgment that the Port recover attorney's fees and reverse and render judgment that Zachry take nothing on its claims.


                              /s/           Sharon McCally
                                            Justice

Panel consists of Justices Boyce, Christopher, and McCally. (Justice Christopher, J., dissenting).