**Affirmed in Part and Reversed and Remanded in Part and Majority and Dissenting Opinions filed August 13, 2013.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-12-00163-CV

## LYDA SWINERTON BUILDERS, INC, Appellant

## V.

## CATHAY BANK, Appellee

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2008-64001A**

## M A J O R I T Y   O P I N I O N

This lien priority case comes to us on appeal from the trial court's rulings on cross-motions for final summary judgment. The appeal presents two issues involving two special types of real property liens.

We first address the scope of a builder's release of its mechanic's lien. *See generally* Tex. Prop. Code Ann. Ch. 53 (West 2007 & Supp. 2012). We conclude that the release at issue here did exactly what it purported to do: it released a previous mechanic's lien on one of the tracts of land at issue. The release did not

mention the underlying debt or the filing of future liens, so we conclude that with one exception, it did not affect the builder's entitlement to the unpaid portion of its debt or its ability to file new liens. Nonetheless, there are fact questions regarding whether the liens that the builder filed after releasing its initial lien comply with the applicable statutes. These fact questions largely preclude summary judgment on the validity of the post-release liens.

Next, we apply subrogation doctrines to a tax lien. Subrogation gives someone who pays a debt the lien priority of the creditor paid. Normally, subrogation is permissible because it does not alter the rights of junior lienholders; it merely alters the party to whom they are junior. When a party satisfies a tax lien, however, allowing subrogation to the taxing authority's priority position may inequitably circumvent notice and foreclosure requirements that would otherwise apply. Fact issues preclude us from resolving the equities on this record. Therefore, with one exception described below, we reverse the trial court's summary judgment and remand the case for further proceedings.

## BACKGROUND

Lyda Swinerton Builders, Inc. (the builder) agreed to improve real property owned by Park 8 Place, L.P. (the developer), but the improvements never progressed very far. This case began when the builder sued the developer, but the developer filed for bankruptcy protection and is no longer a party. The only parties remaining are two of the developer's unpaid creditors: the builder and Cathay Bank. Both claim a priority interest in portions of the property that the developer planned to develop. We refer to these disputed tracts as "Parcel A" and "Parcel B."[1] Our task is to determine priority as between the builder (which claims priority

_____

[1] This case involves six contiguous tracts of land, which Exhibit B to the builder's summary judgment motion designates as tracts I–VI. The builder concedes the bank's superior

2

based upon its mechanic's liens) and the bank (which claims priority based upon deeds of trust and a tax lien that it satisfied).

The builder began work on the project in February 2007.[2] Over the next several months, the builder completed "dirt," utility, and foundation work. During the same period, the bank lent the developer approximately $800,000 secured by a deed of trust on Parcel B and approximately $500,000 secured by a deed of trust encumbering the entire property.[3]

In October 2007, work ceased due to "payment issues" and never resumed. That month, the builder filed its first mechanic's lien affidavit. The affidavit reflected a lien of approximately $3.2 million and only encumbered Parcel A. Generally, mechanic's liens like this one relate back to the start of work for priority purposes, regardless of when the mechanic files its lien affidavit. *See Diversified Mortg. Investors v. Lloyd D. Blaylock Gen. Contractor, Inc.*, 576 S.W.2d 794, 800 (Tex. 1978). Thus, although the builder filed its affidavit after the bank had obtained its deed of trust liens, the builder's lien nonetheless had priority because it related back to the start of work in February 2007.

On October 31, 2007, shortly after the builder filed its first lien affidavit, the bank lent the developer approximately $1.9 million. A deed of trust encumbering both Parcels A and B secured the bank's loan. The builder was paid $1.5 million

_____

interest in tracts II, IV, and VI, so this opinion only addresses tracts I, III, and V. We omit details relating to the parcels that are not in dispute. Moreover, for our purposes, it is unnecessary to distinguish between tracts III and V, so we refer to those tracts collectively as "Parcel A." We refer to tract I as "Parcel B."

[2] "'Work' means any part of construction or repair performed under an original contract." Tex. Prop. Code Ann. § 53.001(14). For purposes of this appeal, the parties do not dispute when the builder began work.

[3] The exact lien amounts are not relevant to our analysis, so we state them as round numbers throughout.

3

of the loan proceeds against the developer's outstanding debt.[4] The builder then filed a lien release. We will discuss the release in detail later, but for now it suffices to say that the document recited the receipt of $1.5 million and purported to release the builder's $3.2 million lien.

On the same day that the builder signed its release, the bank used a portion of the loan to satisfy outstanding tax liens against the property. By statute, these tax liens are automatically senior to most other real property liens. *See* Tex. Tax Code Ann. § 32.05(b). The bank later claimed that the principle of subrogation entitled it to the taxing authority's lien position for the portion of the loan used to pay taxes. *See generally Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333 (Tex. 1980).

On November 13, 2007, soon after filing its release, the builder filed an "[a]mended" lien affidavit reciting a debt of approximately $2.9 million. This sum included both the unpaid portion of the developer's pre-release debt (approximately $1.7 million) and amounts for post-release expenses that the builder had since incurred. Like the builder's first lien affidavit, this one covered only Parcel A.

The builder contends this post-release affidavit, as a mechanic's lien, related back to the start of work in February 2007. As a result, according to the builder, it now had a $2.9 million lien that was senior to the bank's deeds of trust, notwithstanding the lien release it had just filed.

Although the builder stated in its lien affidavit that it had incurred post-

---

[4] Approximately $400,000 of this payment went to a subcontractor that is not a party to this appeal. In its brief, the builder appears to concede that this payment to the subcontractor also reduced its claim against the developer, so our analysis assumes this is the case. If we misapprehend the transaction, nothing in this opinion prevents a party from asserting on remand that the payment to the subcontractor did not reduce the builder's claim against the developer.

release expenses, no post-release work had occurred on the property. The builder contends that even though it had stopped working, it remained on the site at the developer's request. The post-release expenses reflected in the affidavit were "administrative and equipment rental costs related to maintaining the site at an estimated $200,000 per month."

Over the ensuing months, the developer made at least one partial payment, but the developer's payment did not keep pace with the builder's continually accruing expenses. In May 2008, the builder sent the developer a letter stating that if the developer failed to cure its debt, the builder would leave the project site and terminate the contract. The developer did not cure its debt, but the builder nonetheless remained on the site.

Indeed, after sending this termination letter, the builder "continued to maintain its office facilities at the Project, continued to store materials and equipment at the Project, and maintained water, sewer, power, phones and data connections at the office complex." It also continued to bill the developer for these expenses and to file lien affidavits to secure payment. Each new amended affidavit reflected the current total owed and each encumbered both Parcel A and Parcel B.

While still on the property accruing expenses (allegedly still at the developer's request), the builder sued the developer in October 2008. The bank intervened shortly thereafter, claiming a superior interest in the property. The trial court eventually severed this lien priority dispute from the builder's action against the developer.

With all this litigation pending, the builder filed its final lien affidavit in January 2009. This was over a year after the builder's last work on the project, six months after its termination letter, and three months after filing its lawsuit. The final amended affidavit reflected a lien on Parcels A and B in the amount of $6.75

5

million, representing the builder's total expenses. As a mechanic's lien, the builder contends this lien related back to the start of work—almost two years earlier—and was therefore senior to the bank's deed of trust liens on Parcels A and B. After filing this final lien, the builder remained on the property for another thirteen months.

Shortly after the builder finally decamped from the property in March 2010, the bank foreclosed on its October 31, 2007 deed of trust. The builder received notice of the trustee's sale, but contends it was unaware that the bank intended to foreclose on a senior tax lien. The builder contends that, "had [it] known that [the bank] was foreclosing . . . transferred tax liens, [it] could have . . . bid on the property at the foreclosure sale to preserve its interest."

But the builder did not bid at the foreclosure sale. Instead, the bank purchased the property for $10,000. Because this amount was less than the bank's alleged senior tax lien, the bank contends its foreclosure extinguished all junior liens—including the builder's. *See I-10 Colony, Inc. v. Chao Kuan Lee*, 393 S.W.3d 467, 472 (Tex. App.—Houston [14th Dist.] 2012, pet. filed) ("It is well settled in Texas that a valid foreclosure on a senior lien . . . extinguishes a junior lien . . . if there are not sufficient excess proceeds from the foreclosure sale to satisfy the junior lien."). The bank thus argues that, as a result of this sale, it owned the property outright.

In the severed lien priority litigation, the parties filed cross-motions for final summary judgment. The builder argued that because its lien related back to February 2007, it was senior to the bank's. Thus, the builder argued that the bank's purchase of the property at its own foreclosure sale was subject to the builder's senior lien.

The bank contended that it was entitled to the property for two reasons.

6

First, the bank argued that the builder's release fully terminated any interest it had in the property and prevented it from filing new liens. Second, the bank contended that its foreclosure of a senior tax lien extinguished the builder's interest in the property.

The trial court granted the bank's motion and denied the builder's. It held that the bank owned the property "free and clear" of the builder's claims. This appeal followed.

ANALYSIS

## I.    Standard of review

We review a trial court's order granting traditional summary judgment de novo. *Olmstead v. Napoli*, 383 S.W.3d 650, 652 (Tex. App.—Houston [14th Dist.] 2012, no pet.). To be entitled to summary judgment, the movant must demonstrate that no genuine issues of material fact exist and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). If the movant does so, the burden shifts to the non-movant to produce evidence sufficient to raise a fact issue. *Olmstead*, 383 S.W.3d at 652. When reviewing a summary judgment motion, we cannot read between the lines or infer from the pleadings or evidence any grounds for summary judgment other than those expressly set forth before the trial court. *Id.*

The builder presents two issues on appeal, which we address together: whether the trial court erred in granting the bank's motion for summary judgment, and whether it erred in denying the builder's motion. When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *Id.* When, as here, the trial court's order granting summary judgment does not specify the grounds on which it relied, the

7

summary judgment will be affirmed if any of the theories advanced are meritorious. *Id.* Here, the two grounds advanced for summary judgment in the bank's favor are (1) the builder's release and (2) the bank's alleged foreclosure of tax liens. We address these grounds in turn.

## II.    Although the builder fully released its initial lien on Parcel A, it did not waive its right to file new liens covering other property or securing payment for post-release expenses, and there are fact questions concerning the validity of those new liens.

One of the parties' principal disputes concerns the builder's mechanic's lien. Specifically, the parties dispute (1) the effect of the builder's release upon its initial lien and upon its ability to file subsequent liens, and (2) the validity of the builder's post-release liens. We begin with some undisputed general principles.

"As a general rule, a properly perfected mechanic's lien 'relates back' to a time referred to as the inception of the lien for the purpose of determining lien priorities." *Diversified Mortg. Investors*, 576 S.W.2d at 800. In most cases, "the time of inception of a mechanic's lien is the commencement of construction of improvements or delivery of materials to the land on which the improvements are to be located and on which the materials are to be used." Tex. Prop. Code Ann. § 53.124(a).

Here, neither party disputes that the relevant date for inception of the builder's liens is February 2007. Thus, if the builder's lien affidavits are effective, they all relate back to February 2007, and the bank's relevant deeds of trust are junior to them. The bank argues these liens are ineffective, however, because of (1) the builder's release and (2) flaws in the post-release liens themselves. As explained below, we hold that with one exception, the bank is incorrect regarding the release and that fact issues regarding the validity of the post-release liens preclude summary judgment for either party.

8

**A.** **The release did exactly what it said: it released the builder's initial lien and nothing more.**

Omitting the formal parts, the builder's October 2007 release reads as follows:

RELEASE OF LIEN

The [builder] is a holder of a lien ("the lien") in the amount of $3,228,444.50 ("the indebtedness") filed originally on or about October 10, 2007 [in the] Real Property Records of Harris County, Texas regarding the real property and improvements thereon ("the property") generally described as Park 8, Tower B, [the property's address] and more particularly described as follows:

[Description of Parcel A].

FOR AND IN CONSIDERATION of $1,500,000.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the [builder] does hereby release and discharge the property from this lien.

A release is a writing that provides that a duty or obligation owed to one party to the release is discharged, either immediately or upon the occurrence of a condition. *See Port of Houston Auth. of Harris Cnty. v. Zachry Const. Corp.*, 377 S.W.3d 841, 854 (Tex. App.—Houston [14th Dist.] 2012, pet. filed). Releases are subject to the usual rules of contract construction. *Id.* As in other instances of contract construction, our primary concern is to ascertain the intent of the parties at the time of the execution of the alleged release as expressed in the release. *Id.* To construe the release, we may examine evidence of the circumstances surrounding its negotiation and execution. *Id.* We may also consider the title of the document, but it is not dispositive. *Id.*

Here, the parties present multiple alternative interpretations of the two-sentence release. They dispute the release's effect on the builder's initial October 2007 lien, on the underlying debt, and on the builder's ability to file subsequent

9

liens. Below, we discuss in detail what the release does and why it does not do all of the work that the parties assign to it.

The short answer is that the release only says that the builder is releasing the full amount of its initial lien against Parcel A. The builder argues that notwithstanding the release, it could "re-file" a lien for the unpaid portion of the same debt against the same parcel of land. We disagree because allowing the builder to do so would render the release meaningless. Thus, the release extinguished the builder's initial lien and prevented it from reasserting the same lien against Parcel A for the unpaid portion of the pre-release debt.

The bank argues that the release also did other things, but the document in front of us does not mention them. For example, the bank argues that the release not only released the lien, but also forgave the unpaid portion of the initial debt. The release does not say that. The bank also argues that the release prevented the builder from filing liens for subsequent expenses. The release does not say that either. Finally, the bank contends that the release prevented the builder from securing the unpaid portion of its initial debt with a lien on Parcel B. The release also does not say that—it only mentions Parcel A. Accordingly, the release does not entitle the bank to the final summary judgment it received below.

> ### 1. *The release unambiguously released the full amount of the initial lien, but it did not forgive or cancel the unpaid portion of the pre-release debt.*

To explain these conclusions, we begin with the release's effect on the builder's pre-release lien and debt. The builder argues that it only released its initial October 2007 lien to the extent of the payment it received. More specifically, because it only received $1.5 million of the $3.2 million it was owed, the builder contends it only released $1.5 million of the initial lien. We disagree.

10

The release contains just two sentences. The first describes the lien and the property, stating that the lien secures a debt of $3.2 million. The second "release[s] and discharge[s] the property from *this lien*" "for and in consideration of $1,500,000.00" (emphasis added and capitalization omitted). This language does precisely what it says: it releases the whole lien. The builder's contrary interpretation is inconsistent with the unambiguous language of the release and therefore unreasonable.

Notwithstanding this plain language, the builder argues that section 53.152(a) of the Property Code required it to release its lien "to the extent of the indebtedness paid," so we should construe its release to have only this effect. Although "[s]ection 53.152 delineates the minimal obligation of a contractor to release a lien upon receiving payment, . . . nothing in the statute suggests that broader releases may not be executed." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 297 (5th Cir. 2010). Here, in exchange for immediate payment, the builder executed a broader release and thereby fully released its initial lien.

But the release itself does not forgive the unpaid portion of the developer's underlying debt.[5] Thus, although the release extinguished the lien, nothing in the document suggests the builder intended to forgive the remaining $1.7 million debt that had not been paid. To the contrary, the release distinguishes the "indebtedness" from the "lien" and releases only the lien.

The document's first sentence is definitional: it defines "the lien," "the

---

[5] The builder asks us to take judicial notice of a judgment it obtained against the developer, which was based on an agreed arbitration award and included the unpaid portion of the pre-release debt. The bank urges us not to take judicial notice. We need not address the issue because the judgment against the developer does not affect our decision. As discussed above, the release alone does not establish that the developer's entire pre-release debt has been satisfied, and we reject the bank's argument that it does. Judicial notice that the debt has been reduced to judgment is unnecessary to reach this conclusion.

indebtedness," and "the property." The use of separate terms to describe "the lien" and "the indebtedness" demonstrates a desire to distinguish one from the other. The release's second sentence is operative: it "release[s] and discharge[s] the property from this lien." The second sentence does not mention the indebtedness. In this way, the builder unambiguously demonstrated its intent to release only "the lien" without forgiving the unpaid portion of the separately defined "indebtedness."

Moreover, the circumstances of the transaction support this construction of the release. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) ("If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing."). To the extent the release evidences a contract (*see* n.6, *infra*), the parties to that contract are the bank and the builder. The bank sought a priority interest in the property, while the builder sought partial payment.

There is no evidence, however, that either party sought to reduce the developer's debt. As for the builder, it had no reason to forgive the developer's debt because it wanted payment for its work. In any event, there is no evidence that the builder agreed to—or was even asked to—forgive the unpaid portion of the underlying debt. As for the bank, nothing in the record suggests that the bank had any interest in reducing the developer's indebtedness to the builder. The bank wanted to get the builder's previously filed lien out of the priority line, not to protect the developer.

We must also "keep in mind that lien waivers, as their name implies, pertain to lien rights and not to the more general right to payment." 3 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., CONSTRUCTION LAW § 8:151 (2002). Here, neither the release's text nor the context of the transaction establishes that the parties intended

12

to forgive the developer's underlying debt. We therefore reject the bank's contention that the release had this effect.[6]

Thus, following the release of its initial October 2007 lien, the builder held no lien against Parcel A or any other tracts. The developer remained indebted to the builder, however, for the $1.7 million unpaid portion of the pre-release debt.

### 2. *The release prohibited the builder from re-filing a lien against the same property for the remaining pre-release debt.*

The builder next argues the release did not prohibit it from re-filing a lien against the same property for the unpaid portion of the same debt. This construction is unreasonable because it would essentially render the release meaningless.

The release's plain language and the context of the transaction demonstrate that the parties intended for the builder to release its previously filed lien, thereby ensuring the bank's priority position on Parcel A. For this reason, the bank paid the builder $1.5 million, and in exchange the builder fully released its lien. Once released, the lien could not be revived. *See Apex Fin. Corp. v. Brown*, 7 S.W.3d 820, 830 (Tex. App.—Texarkana 1999, no pet.). Although a release may be rescinded for failure of consideration, *see Murray v. Crest Const., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995), in this case the consideration was paid, the release was filed, and the builder presents no argument that would permit it to rescind the release in part.

Allowing the builder to re-file a lien for a portion of the same debt against

---

[6] This opinion does not foreclose the parties' ability on remand to introduce evidence of agreements supplementing the release's plain meaning. Although we conclude the release is unambiguous, the parties have not argued that the release is a fully integrated expression of their agreement, and we express no opinion on that issue. *See generally Garner v. Redeaux*, 678 S.W.2d 124, 128–29 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). The parties' arguments thus far rely solely upon the release, and we limit our analysis accordingly.

13

the same property, however, would effectively allow a rescission. Nothing in the record suggests that the parties intended for the builder to retain such unilateral authority. To the contrary, for the bank to obtain the security it bargained for, the pre-release lien had to stay fully released. We therefore reject the builder's argument that the release permitted it to re-file liens against Parcel A to secure the unpaid portion of the pre-release debt.

### 3. The release did not prohibit the builder from filing new liens on other tracts for the unpaid debt or liens on any tracts for post-release expenses.

Having determined the release's effect on the builder's October 2007 lien and the developer's pre-release debt, we turn to the release's effect on the builder's post-release liens.

After filing the release, the builder filed four amended lien affidavits to secure payment for the unpaid portion of the pre-release debt and for expenses that the builder continued to incur. The first of these documents, filed shortly after the release in November 2007, asserted a lien only against Parcel A. The builder filed a second amended affidavit in June 2008, a third in October, and a fourth in January 2009. These three subsequent affidavits placed liens on the entire property, including Parcels A and B. Each affidavit updates the total amount owed by the developer at the time of filing. The final affidavit states that approximately $6.75 million is owed.

The bank argues that summary judgment in its favor was proper because the builder's release prevented it from filing any further liens on any tracts to secure any of the developer's debt. As discussed above, the bank is right insofar as the release prohibited the builder from re-filing a lien on Parcel A for the unpaid portion of the pre-release debt, and it is entitled to partial summary judgment to

14

that extent.[7]  As to the bank's other contentions, we disagree.

Neither the release itself nor any summary judgment evidence suggests that the builder agreed to refrain from filing new liens if it incurred additional expenses.  By its terms, the release affected only the builder's pre-release lien.  It said nothing about the builder's ability to file future liens for post-release expenses.

In this way, the release differs from that in *Apex Financial Corporation v. Brown*, upon which the bank relies.  In that case, the waiver released lien rights based not only upon "labor or materials furnished," but also upon labor and materials "*to be furnished* in the future."  7 S.W.3d at 830.  The court held that this language allowed the party challenging the subsequently filed liens to "rely on the fact that the . . . property would not be burdened by a statutory mechanic's lien." *Id*.

The release here, by contrast, does not purport to waive the builder's right to file new liens.  Instead, it refers only to the lien already filed and the indebtedness already incurred.  We therefore do not construe the release as barring liens for post-release expenses.

Similarly, neither the release itself nor any summary judgment evidence suggests the builder agreed to refrain from filing a lien against tracts other than Parcel A to secure the unpaid portion of the pre-release debt.  The builder's initial October 2007 lien only encumbered Parcel A, and its release purported to release only this lien.  The release did not mention Parcel B or the property's other tracts, so we do not construe it to prevent the filing of liens against those tracts to secure the unpaid portion of the developer's pre-release debt.

---

[7] *See* Tex. R. App. P. 43.2(a); *PAS, Inc. v. Engel*, 350 S.W.3d 602, 617 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (affirming summary judgment on fraud claim to extent based upon a certain misrepresentation).

This construction is consistent with the release's plain meaning and the context of the transaction. The builder released Parcel A from its initial lien, and it cannot avoid this consequence by simply re-filing. But there is no evidence that the parties intended the release to prevent the builder from securing the remaining pre-release debt—or any other debt for that matter—with a lien on Parcel B. Nor is there any contention that Parcel B is outside the "[p]roperty to [w]hich [the] [l]ien [e]xtends" under Texas Property Code section 53.022. Thus, on the record before us, nothing prevented the builder from filing a lien against Parcel B to secure the unpaid portion of the developer's pre-release debt.

The bank makes additional arguments to avoid this result, but they do not change our conclusion that the release does not entitle the bank to final summary judgment. The bank contends that we must construe the release to waive additional rights because the release's language differs from language in other "partial releases" that the builder filed. Although the relevant release does differ from others in the record, its language still does not waive the builder's right to file future liens for post-release expenses or forgive the developer's unpaid debt.

The bank also contends that the builder could not "amend" its October 2007 lien because it fully released this lien and therefore had nothing to amend. This contention must be evaluated under the mechanic's lien statute because the liens at issue here are creatures of statute. Indeed, "'[a] subcontractor's lien rights are totally dependent on its compliance with the statutes authorizing the lien.'" *K & N Builder Sales, Inc. v. Baldwin*, No. 14-12-00012-CV, 2013 WL 1279292, at *3 (Tex. App.—Houston [14th Dist.] Mar. 28, 2013, no pet.) (mem. op.) (quoting *First Nat'l Bank in Graham v. Sledge*, 653 S.W.2d 283, 285 (Tex. 1983)). Although a general contractor may have common law, contractual, and constitutional lien rights as well, the builder has not relied upon such rights in this

16

appeal. Thus, to determine whether the builder has a statutory lien based upon its amended affidavits, we need only "compare the steps the [builder] took to perfect [its] liens with the statutory requirements." *First Nat'l Bank in Graham*, 653 S.W.2d at 286.

The required contents of a lien affidavit are prescribed in section 53.054(a) of the Texas Property Code. We conclude that each post-release affidavit complies with these requirements, and the bank does not argue otherwise. Nothing in the statute suggests that the builder sacrificed its entitlement to a lien in its November 2007 affidavit by adding a statement that this affidavit "amends" the original October 2007 affidavit, which perfected a lien that had been released in the interim.[8] To the contrary, the supreme court has made clear that "substantial compliance with the statutes is sufficient to perfect a lien." *Id.* at 285.

Our dissenting colleague disagrees with this conclusion, relying on the affidavits' form rather than their substance. In her view, the first post-release affidavit in November 2007 is ineffectual because it purports to amend the October 2007 affidavit, but there was nothing to amend because the lien perfected by that affidavit had been released. Moreover, because the post-release affidavits amend one another, she contends those affidavits are ineffectual as well.

We disagree with this analysis because it is contrary to the language, established interpretation, and purpose of the mechanic's lien statutes. Nothing in the language of the statutes suggests that a lien's effectiveness hinges upon whether affidavits filed after a release describe themselves as "amending" or "replacing" the pre-release affidavit. This omission is telling because the statutes

---

[8] All of the lien affidavits are substantively identical with the exception of: (1) the amended affidavits' references to amendment in the caption and in one numbered sentence; (2) differences in the amount of the claim; and (3) beginning with the second amended affidavit in June 2008, an expansion of the property subject to the lien.

not only contemplate, but require, releases whenever payment is received. S*ee* Tex. Prop. Code Ann. § 53.152(a). Release documents are "an intended and customary part of the payment process" in construction transactions. 3 BRUNER & O'CONNOR, *supra*.

Given the prevalence and necessity of releases, one would expect that if the Legislature intended "amended" post-release affidavits to be entirely ineffective, it would have expressed that intent. Certainly some statutory warning would be appropriate if, as the dissent argues, a mechanic who proceeds by amendment loses all security for expenses incurred after filing a statutorily required release. Because there is no such warning or expression of legislative intent, we adhere to the requirements the Legislature did establish in section 53.054(a), which are met here as explained above.

Cases interpreting the mechanic's lien statutes also counsel against invalidating a lien on a purely technical basis. For example, "[i]t is well settled that the mechanic's and materialman's lien statutes are to be liberally construed for the purpose of protecting laborers and materialmen." *Ready Cable, Inc. v. RJP S. Comfort Homes, Inc.*, 295 S.W.3d 763, 765 (Tex. App.—Austin 2009, no pet.). And courts have been more willing to excuse a mistake or omission in cases where no party is prejudiced by the defect. *Id.* (citing cases). Indeed, "[t]he Legislature did not intend that the materialman should lose his lien through the technicalities of a warning, where the owner was not misled to his prejudice." *Hunt Developers, Inc. v. W. Steel Co.*, 409 S.W.2d 443, 449 (Tex. Civ. App.—Corpus Christi 1966, no writ).

Here, there is no contention that the bank, the developer, or anyone else relied upon or was misled by the references to amendment in the post-release affidavits. Each affidavit was properly filed in the real property records, each

18

clearly identifies the encumbered property, and each states the amount of the lien.[9]

Moreover, the purpose of these affidavits was to give notice of the builder's interest in the property. *See Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 464–65 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (purpose of serving lien affidavits on property owner is to give notice). If anything, filing the post-release affidavits as amendments furthered this purpose. The use of the amendment format ensured that all of the amendments were filed together, thus clarifying that each affidavit superseded the previous one and that the most recent stated the full extent of the builder's interest.

At bottom, the dissent rests on the rule that "[i]f there is nothing for an amended instrument to amend, then such an amended instrument is itself ineffectual nullity." *Post*, at 8. The dissent cites no authority for applying this rule to mechanic's lien affidavits, but would apparently apply it to instruments of every kind. Of course, we agree that this rule may apply in some situations. *See, e.g.*, *Lazo v. RSI Int'l, Inc.*, No. 14-06-00432-CV, 2007 WL 2447299, at \*4 (Tex. App.—Houston [14th Dist.] Aug. 30, 2007, no pet.) (mem. op.) (endorsement to cancelled insurance policy ineffective). But it does not apply to amended pleadings, for example. Because an amended pleading replaces the original pleading, *see* Tex. R. Civ. P. 65, no one would argue that a fatal defect in the original pleading that is absent from the amended pleading vitiates the latter simply because it states that it amends the original pleading. We decline to apply the dissent's rule to defeat otherwise valid instruments that effectively serve the purpose for which they were created.[10]

---

[9] Although the lien perfected by the original October 2007 affidavit was released, the affidavit itself did not cease to exist, *cf. post,* at 8–9, and it is in the record before this Court.

[10] *Cf. Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 770 (Tex. 1994) (principle that "a contract shall be construed . . . in light of the purposes and objects for which it was made" is

19

Here, the amended affidavits gave notice of the builder's interest in the property in compliance with the applicable statutes. Accordingly, they perfected the builder's lien.[11]

**B.** **Whether the builder timely filed its post-release lien affidavits and whether its post-release expenses were for "materials" as defined in the mechanic's lien statute involve fact questions that preclude final summary judgment for either party.**

The bank next contends that even if the builder's release allowed it to file subsequent lien affidavits, its post-release affidavits were nonetheless ineffective because (1) they were untimely and (2) the expenses referenced in the affidavits could not give rise to mechanic's liens because they were not for "materials furnished for construction" as required by the mechanic's lien statute.[12] We address each argument in turn. Because there are fact questions regarding both arguments, neither party is entitled to final summary judgment regarding the validity of the post-release mechanic's liens.

---

"well-settled"); *Union Pac. Res. Grp. v. Neinast*, 67 S.W.3d 275, 282 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (lease covenants will be implied to, among other things, "give effect to the actual intention of the parties . . . and the purposes sought to be accomplished [by their contract or conveyance]"); *Hicks v. Loveless*, 714 S.W.2d 30, 34 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (deed restrictions construed "in light of the obvious purpose and intent of the restrictions").

[11] The dissent's "Supplemental Background" section discusses the correspondence between the builder and the bank, perhaps suggesting that this correspondence influences its interpretation of the post-release affidavits. As far as we can tell, however, it does not. The dissent's rule would apply with equal force if the only parties were a property owner and a mechanic who received payment and filed the statutorily required release. If the mechanic filed lien affidavits as amendments after filing a release, then the dissent would hold that nothing secures the mechanic's post-release expenses. As discussed above, we see no reason why this should be the case.

[12] The bank's brief conflates timeliness with whether the builder's expenses entitle it to a mechanic's lien, but we construe the brief to raise both issues. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver.").

20

### 1. The timeliness of the builder's post-release liens presents questions of fact.

Because mechanic's liens attach on the day work begins, but need not be recorded until after work concludes, there can be notice problems. That is, a party relying solely upon the real property records will be unaware of a mechanic's senior lien until after the mechanic files its affidavit. *See Diversified Mortg. Investors*, 576 S.W.2d at 801.

The mechanic's visible construction activity on the property fills this potential notice gap. *Id*. at 801–02. Thus, mechanic's liens first attach at "the commencement of construction . . . or delivery of materials," that is "visible from inspection of the land." Tex. Prop. Code Ann. § 53.124. Mechanic's lien statutes also protect third parties by requiring mechanics to file their affidavits within a fixed period after their presence on the property ceases. *See id*. § 53.052. In this way, when work is ongoing, third parties can observe the mechanic's presence and assume that liens may be forthcoming. *See Diversified Mortg. Investors*, 576 S.W.2d at 801. After work concludes, a party can avoid mechanic's liens by waiting for the lien-filing period to expire. *See id*.

The clock on the filing period starts ticking when "indebtedness accrues." Here, the builder had to file its lien affidavit "not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrue[d]." Tex. Prop. Code Ann. § 53.052.

Several events can trigger the accrual of indebtedness, but each stands in for the cessation of work. For example, indebtedness to an original contractor[13] accrues on the last day of a month during which either the contractor or the

---

[13] The parties agree that the builder is an "original contractor" and this was an "original contract."

21

property owner receives a written declaration from the other party terminating the contract. *Id.* § 53.053(b)(1). Absent termination, indebtedness accrues "on the last day of the month in which the original contract has been completed, finally settled, or abandoned." *Id.* § 53.053(b)(2).

For our purposes, the only relevant accrual triggers are abandonment and termination. The builder argues it never abandoned or terminated the project until it left the site in March 2010, so its post-release lien affidavits filed between November 2007 and January 2009 were all timely. For its part, the bank argues that the builder abandoned the project when it stopped working in October 2007, and thus all but the first of the builder's post-release lien affidavits were untimely because they were filed after February 15, 2008. We cannot agree with either party because the summary judgment evidence fails to conclusively establish when the builder abandoned or terminated the contract.

***Fact questions regarding abandonment.*** Chapter 53 of the Property Code does not define "abandoned." S*ee* Tex. Prop. Code Ann. § 53.001. Moreover, neither party has cited, and our research has not revealed, a Texas authority exploring the meaning of "abandoned" as applied to mechanic's liens. We therefore use the word's ordinary meaning. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). "Abandon," as used in this context, means "to turn from or relinquish." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2 (1993).

Courts across the country disagree about whether the objective appearance of abandonment triggers a mechanic's filing obligation or whether the parties must actually intend to abandon the project. *See Superior Constr. Servs., Inc. v. Belton*, 749 N.W.2d 388, 391 (Minn. Ct. App. 2008) (discussing the two approaches). The courts that focus upon the notice-giving purpose of ongoing work believe that the

22

parties' "secret purposes" have no place in the analysis. *Allison v. Schuler*, 36 P.2d 519, 522 (N.M. 1934). These courts consider only the objective appearance of abandonment. *See id.* Other courts emphasize the mechanic's need for certainty in order to safeguard its rights and therefore include in their analysis the parties' subjective intent regarding abandonment. *See Superior Constr. Servs.*, 749 N.W.2d at 391.

The parties here have not asked us to adopt one side of this split over the other, and we conclude that it is unnecessary to do so. Based upon the summary judgment evidence, both approaches raise fact questions. Accordingly, neither party is entitled to summary judgment under either approach.

Regarding the parties' subjective intent, the builder argues that a single fact conclusively establishes that it did not abandon the project until March 2010: the developer's request that it remain on the site until that time. Given the unique facts of this case, we disagree.

The project began deteriorating long before the builder's March 2010 departure, and there is evidence that one or both of the parties may have abandoned the project prior to that time. Indeed, two and a half years passed between the day the builder stopped working and the day it left the project site. During that time, the builder did no work, received little payment, sent notice of its intent to terminate the contract, and sued the developer. The builder is correct that its continuing presence on the property supports an inference that it did not abandon the project, but these other developments support a contrary inference. This evidentiary conflict raises a fact question that cannot be resolved on summary judgment.

We also reject the builder's argument that its summary judgment evidence conclusively established that the parties actually intended to complete the project.

23

The builder relies upon affidavits from its operations manager and a letter that it sent to the developer in May 2008. One affidavit says that "[the developer] repeatedly promised that it was in the process of securing additional financing, and that [the builder] should not demobilize." The other states that the builder "did not terminate the contract, abandon the contract or demobilize the Project" when it stopped working in October 2007 "[b]ecause of [the developer's] repeated promises that it was in the process of securing additional financing."

Neither affidavit reflects exactly when the developer made these promises or exactly what promises it made. Without this information, the mere existence of promises as early as October 2007 fails to establish conclusively the non-abandonment of the project prior to March 2010.

The builder's letter to the developer falls short for similar reasons. The May 2008 letter states that "[the builder] at the request of [the developer] has remained mobilized at the site." Even if the developer made this request prior to May 2008, however, such a request would not conclusively establish that the intent to complete the project survived until March 2010. The summary judgment evidence fails to establish conclusively when the parties intended to abandon the project, so neither party is entitled to summary judgment based upon abandonment.

Turning to the objective appearance of abandonment, the builder argues that its equipment remained on the property, signaling to third parties that it was working and that its liens could come at any time. The bank focuses upon the long period during which no work occurred, arguing that a third party would surmise the work was over.

The parties' arguments are both correct, as far as they go, and demonstrate the existence of a fact question on abandonment. Maintaining equipment on the property certainly suggests work may be ongoing. But the builder's extended

24

period of inactivity suggests that, at some point, the builder and the developer may have given up the project. Deciding if and when the parties abandoned the contract is therefore a fact question that cannot be resolved on summary judgment.

***Fact questions regarding termination.*** For purposes of a statutory mechanic's lien, a contract terminates when one party receives a written notice of termination from the other. Tex. Prop. Code Ann. § 53.053(b)(1). The builder contends that "[i]t is undisputed" that it "*never received* any notice the Contract was terminated" (emphasis added). This appears to be correct. But the builder alleged in its original petition below that it "*served* notice of intent to terminate the Contract" "[b]y late May, 2008" (emphasis added). At this point, the builder contended it had "bec[o]me apparent that [the developer] was incapable of obtaining the financing necessary to complete the Project." The builder's termination letter stated that, if the developer failed to cure its default, the contract would terminate on May 27, 2008.[14]

Although this letter appears in the record, we do not believe it conclusively proves that the contract terminated in May or June of 2008. First, there is no evidence that the developer received this written notice, and section 53.053(b)(1) provides that receipt triggers the accrual of indebtedness, not dispatch. Moreover, neither party's brief thoroughly addresses the termination letter's effect. Thus, the issue of termination also cannot be resolved on summary judgment.

---

[14] The letter is dated May 20, 2008, and states that the developer's failure to cure its default within seven days will "terminate the Contract." The letter also states, however, that it is a "Notice of Intent to Terminate" and "[p]ursuant to" "Article 14.1.1" of the parties' construction agreement. This provision appears to provide for a fifteen-business-day cure period. In any event, even if the contract terminated in June 2008, a lien affidavit would have been due by the fifteenth day of the fourth month thereafter, i.e., October 15, 2008. *See* Tex. Prop. Code Ann. § 53.052(a). Thus, if the letter terminated the contract in May or June of 2008 (a matter upon which we express no opinion), then the builder's affidavits filed on October 23, 2008, and January 16, 2009, would appear to be untimely.

## 2. *The builder's filing of a single timely mechanic's lien does not render its amended liens timely under the statute.*

The builder argues, however, that issues of termination and abandonment do not prevent final summary judgment in its favor. The builder points out that even if its later post-release affidavits were untimely, its first amended lien affidavit filed in November 2007 was still timely. The builder then contends that any late affidavits "relat[e] back" to this timely one. Under this theory, the builder's single timely affidavit enabled it to more than double its lien on the property at any time regardless of when the statutory filing period expired. We disagree with this construction of the filing requirements.

The builder's construction disregards the language of the relevant statutes. To obtain a valid lien, a mechanic "must file an affidavit" within the statutory period. Tex. Prop. Code Ann. § 53.052. This affidavit "must contain substantially . . . a sworn statement of the amount of the claim." *Id.* § 53.054(a). Here, the first amended affidavit, assuming it was timely, did not contain a substantially correct statement of the amount the builder ultimately claimed. The first amended affidavit stated a claim for approximately $2.9 million, and the builder ultimately claimed approximately $6.75 million.

Thus, the builder's first amended affidavit satisfied *both* the timeliness requirement and the amount-of-the-claim requirement only to the extent of the $2.9 million claim it substantially recited. We therefore reject the builder's argument that its first amended affidavit satisfied the timeliness requirement as to all subsequent affidavits.

Although the bank does not dispute the timeliness of the first amended lien affidavit, we cannot grant a partial summary judgment that this affidavit imposed a valid mechanic's lien. As an initial matter, approximately $1.7 million of the first

26

amended lien was for pre-release expenses that we have held the builder could not reassert against Parcel A. Because the first amended affidavit only mentioned Parcel A, it was ineffective to re-impose a lien for the pre-release expenses, and the builder is entitled to partial summary judgment to that extent. The remaining $1.1 million in the first amended affidavit appears to have been for post-release expenses. As we discuss below, however, the record does not conclusively establish whether the builder could obtain a mechanic's lien for those or other post-release expenses. As a result, notwithstanding the apparent timeliness of the first amended affidavit, fact questions preclude summary judgment as to its effectiveness regarding post-release expenses.

### 3. Whether the builder's post-release expenses were for "material furnished for construction" presents fact questions.

Mechanic's liens secure payment for, among other things, "the labor done or material furnished for the construction or repair." Tex. Prop. Code Ann. § 53.023. As to the post-release liens, there is no contention that the builder "d[id] labor." Rather, the builder argues that its services after construction ceased were "material furnished."

> "Material" means all or part of:
>
> (A) the material, machinery, fixtures, or tools incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption;
>
> (B) rent at a reasonable rate and actual running repairs at a reasonable cost for construction equipment used or reasonably required and delivered for use in the direct prosecution of the work at the site of the construction or repair; or
>
> (C) power, water, fuel, and lubricants consumed or ordered and delivered for consumption in the direct prosecution of the work.

Tex. Prop. Code Ann. § 53.001(4).

The builder generally contends that its post-release expenses fall into these categories. The builder's affidavit states that the expenses were for "maintain[ing] its office facilities at the Project, continu[ing] to store materials and equipment at the Project, and maintain[ing] water, sewer, power, phones and data connections at the office complex."[15]

The bank contends that none of these post-work expenses are "materials" because, once work ceased, nothing was "used" or "consumed" in the "direct prosecution of the work." *See id.* We disagree because the definition of materials does not always require actual use or consumption in the direct prosecution of the work. Instead, mechanic's liens are also available when items are "delivered for" use or consumption. *Id.* In this way, the availability of a mechanic's lien becomes a question of how the parties *intended* to use equipment and services delivered to the project, which is generally a question of fact. *State ex rel. Perrin v. Hoard*, 62 S.W. 1054, 1056 (Tex. 1901).[16]

Here, we cannot determine conclusively from the summary judgment evidence exactly when the developer and builder ceased intending to prosecute the work. Therefore, we cannot tell the extent to which the builder's expenses were for equipment or services delivered for that purpose. Standing alone, the fact that no work ultimately occurred does not answer these questions.

Moreover, to obtain a mechanic's lien for rental expenses, the equipment

---

[15] Aside from the issues noted below, the parties have not briefed whether each of these categories of expenses fall within the statutory definition of "materials." We therefore express no opinion on whether they otherwise qualify as expenses for materials.

[16] *See also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony."); *Viscardi v. Pajestka*, 576 S.W.2d 16, 19 (Tex. 1978) ("The intent of the grantor is a question of fact.").

must be not only "delivered for use," but also "reasonably required" for use in the direct prosecution of the work. Tex. Prop. Code Ann. § 53.001(4)(B). In this case, the builder continued to incur rental expenses for several months after work had ceased even though the developer already owed over $1.7 million and the project had no apparent prospect of adequate financing. At some point, continuing to incur these expenses may have become unreasonable, regardless of the parties' intent. Whether and at exactly what point these expenses stopped being "reasonably required" are questions of fact that cannot be answered conclusively on this record. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 n.6 (Tex. 1997) ("[R]easonableness is ordinarily a question of fact.").

\* \* \*

For these reasons, we affirm the trial court's grant of summary judgment insofar as it held that the builder's lien against Parcel A for the unpaid portion of the pre-release debt is junior to the bank's deed of trust lien. Otherwise, to the extent the trial court's granted summary judgment for the bank based on the release, the summary judgment cannot stand.

## III. Although the bank's failure to comply with the tax lien transfer statutes does not prevent its subrogation to a tax lien, there are fact questions regarding whether equity requires subrogation here.

The parties' other principal dispute concerns whether the bank became subrogated to a senior tax lien that it satisfied with part of its loan proceeds. With a few exceptions that are not relevant here, tax liens are senior to other liens. *See* Tex. Tax Code Ann. § 32.05(b). Thus, if the bank became subrogated to tax liens, these liens would be senior to the builder's mechanic's liens. As a result, foreclosure of the subrogated tax liens would have extinguished the builder's mechanic's lien because the foreclosure sale proceeds were insufficient to satisfy

29

both. *See I-10 Colony, Inc.*, 393 S.W.3d at 472. The bank would therefore own the property free of the builder's liens, and it would be entitled to final summary judgment regardless of the issues discussed in Part II above.

Subrogation is liberally applied and is broad enough to include every instance where one person, not acting voluntarily, pays another's debt. *Lancer Corp. v. Murillo*, 909 S.W.2d 122, 127 (Tex. App.—San Antonio 1995, no writ). As used here, subrogation "essentially allows a subsequent lienholder to take the lien-priority status of a prior lienholder" by satisfying the prior lien's associated debt. *Bank of Am. v. Babu*, 340 S.W.3d 917, 925 (Tex. App.—Dallas 2011, pet. denied). One who pays another's real property taxes often asserts a right to be subrogated to the taxing authority's lien. *E.g., Smart*, 597 S.W.2d at 337–38.

The bank's subrogation arguments focus on a clause in its deed of trust signed by the developer. The deed states that the bank "is subrogated to all rights, liens or interests in any of the Mortgaged Property securing the payment of any obligation satisfied or paid off out of the proceeds of [its] loans." A tax lien was "paid off out of the proceeds of" the bank's loan, so it contends this provision entitles it to subrogation under a contractual subrogation theory. As we explain below, however, the bank's right to subrogation also depends upon equitable considerations.

The builder counters that the bank is not subrogated to the tax lien because (1) the bank failed to comply with a statutory procedure for transferring tax liens, and (2) equitable considerations make subrogation inappropriate here.[17] We

---

[17] The builder also argues that the bank failed to identify the tracts on which it paid taxes. The bank submitted a tax map, however, as an exhibit to one of its summary judgment filings (located at volume 5, page 1111 of the clerk's record). The account identification number on a tract that appears to contain Parcels A and B corresponds to the number on checks issued from the title company to the relevant taxing authorities.

disagree with the builder's first argument but conclude there are fact issues regarding the second that preclude summary judgment on this record.

## A. The tax lien transfer statutes do not eliminate contractual or equitable subrogation of tax liens.

The builder first argues that the bank is not subrogated to the tax lien because it failed to comply with sections 32.06 and 32.065 of the Tax Code.[18]  The principle of subrogation is well established, however.  *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007).  "Perhaps the courts of no state have gone further in applying the doctrine of subrogation than ha[ve] the court[s] of this state."  *Faires v. Cockrill*, 31 S.W. 190, 194 (Tex. 1895) *overruled in part on other grounds by Fox v. Kroeger*, 35 S.W.2d 679, 680 (Tex. 1931).  Moreover, the doctrine has long been applied to tax liens.  *See Stone v. Tilley*, 101 S.W. 201, 201 (Tex. 1907).  Thus, to address the builder's argument, we must determine whether the tax lien transfer statutes provide an exclusive means for acquiring the taxing authority's priority, thereby abrogating common law subrogation of tax liens.

"Of course, statutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended."[19]  *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.,* 236

---

We note, however, that the area of the tract on the tax map appears to be .01 acres smaller than the combined areas of Parcels A and B on the builder's map.  We cannot tell whether this discrepancy results from rounding or if, in fact, the tract on the tax map excludes a small portion of the contested parcels depicted in the builder's map.  To the extent this discrepancy creates a fact issue, the parties can address it on remand.

[18] The builder claims that the version of the statute in effect when the bank satisfied the tax lien prevented subrogation.  We therefore analyze the builder's arguments under that version, *see* Tex. Tax Code Ann. § 32.06, .065 (West 2008), rather than the current version, *see* Tex. Tax Code Ann. § 32.06, .065 (West Supp. 2012).

[19] We understand "common law" in this context to mean "[t]he body of law derived from judicial decisions, rather than from statutes or constitutions."  BLACK'S LAW DICTIONARY 313 (9th ed. 2009).  Thus, although equitable subrogation is technically an equitable remedy as distinguished from a remedy at law, we nonetheless look carefully to determine whether the

S.W.3d 190, 194 (Tex. 2007). When evaluating an argument that a statute deprives a person of a common law right, we will not extend the statute beyond its plain meaning or apply it to cases not clearly within its purview. *Id.* at 194 n.17 (citing *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000)). With this rule in mind, we construe the tax lien statutes, looking first to the plain and common meaning of their words. *See State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).

### 1. The statutes' text shows that they supplement, rather than abrogate, common law subrogation doctrines for tax liens.

We conclude that the statutes upon which the builder relies do not abrogate common law subrogation doctrines for several reasons. The statutes contain language permitting statutory transfers, but not requiring them. Moreover, the statutes expressly limit their foreclosure and notice requirements to statutory transfers; by their terms, the statutes do not apply to subrogated lienholders. Finally, the statutes make tax lien priority available to parties that could not acquire it at common law, suggesting an intent to supplement rather than abrogate pre-existing avenues for obtaining the taxing authority's priority.

We begin with the text of the statutes themselves. The Tax Code permits tax lien transfers by providing that "[a] person may authorize another person to pay the delinquent taxes imposed by a taxing unit," and "[a] tax lien may be transferred to the person who pays the taxes." Tex. Tax Code Ann. § 32.06(a-1), (a-2). Parties wishing to transfer a tax lien under this statute must substantially comply with several requirements. *See Genesis Tax Loan Servs. Inc. v. Kothmann*, 339 S.W.3d

---

Legislature intended abrogation. *Cf. LaSalle Bank*, 246 S.W.3d at 619 (construing amendment to Texas Constitution not to abrogate equitable subrogation); *Smart*, 597 S.W.2d at 338 (describing the "right to *equitable* subrogation" as "aris[ing] in accordance with certain well-established rules *of law*" (emphases added)).

104, 108–111 (Tex. 2011). For example, the transferee—the party receiving the tax lien—must file "a sworn document" with "the collector for the [taxing] unit." Tex. Tax Code Ann. § 32.06(a-1). The document must, among other things, authorize payment of taxes, and it must identify the transferee and the encumbered property. *Id.*

The transferee's compliance with the authorization section triggers obligations for the tax collector. "If a transferee authorized to pay a property owner's taxes pursuant to [the statute's authorization section] pays the taxes," the tax collector must issue a receipt, certify that the taxes are paid, and "identify . . . the date of the transfer" "in a discrete field in the applicable property owner's account." *Id.* § 32.06(b).

After receiving this certification, the transferee must notify "any mortgage servicer and . . . each holder of a recorded first lien encumbering the property" of the transfer. *Id.* § 32.06(b-1). In addition, the transferee must "record a tax lien transferred as provided by this section with the [tax collector's certification] . . . in the deed records of each county in which the property . . . is located." *Id.* § 32.06(d).

There are also special requirements to foreclose tax liens transferred under the statute. For example, absent agreement to the contrary, "foreclosure of a tax lien transferred as provided by [section 32.06] may not be instituted within one year from the date on which the lien is recorded." *Id.* § 32.06(i). Moreover, the foreclosure must be either "in the manner provided by law for foreclosure of tax liens" or by court order pursuant to Texas Rule of Civil Procedure 736, which governs expedited foreclosure proceedings. Tex. Tax Code Ann. § 32.06(c). When proceeding under Rule 736, the transferee must still comply with section 51.002 of the Property Code, concerning deed of trust foreclosures, and section

33

32.065 of the Tax Code. Tex. Tax Code Ann. § 32.06(c)(2). Section 32.065 requires, among other things, that any holder of a recorded lien on the property receive a notice that "THE FORECLOSURE SALE REFFERED TO IN THIS DOCUMENT IS A SUPERIOR TRANSFER TAX LIEN." *Id.* § 32.065(b)(6).

This statutory scheme makes the transfer of a tax lien an option and discusses the rules that apply if the lien is transferred. But nothing in the text of the statute addresses what happens if the lien is not transferred or suggests a legislative intent to prohibit common law subrogation if a party pays a tax lien without transferring it. For example, the statutes provide that parties "may authorize" payment of taxes, and with such authorization "[a] tax lien may be transferred," but transfer is not required. Tex. Tax Code Ann. § 32.06(a-1), (a-2). The statutes also provide foreclosure requirements, but they specifically limit these requirements to "transferee[s] [who] seek[ ] to foreclose a tax lien on the property under [the statute's foreclosure subsection]"; they do not mention subrogated lienholders at all. *Id.* § 32.06(c-1). The statutes create recording requirements, but only for "tax lien[s] transferred as provided by [Section 32.06]." *Id.* § 32.06(d).[20] The permissive language and narrowly defined scope of these statutory provisions demonstrates that the statutes do not provide the exclusive means of acquiring the taxing authority's priority position.

The statutes also broaden the ability of a party who pays a tax lien to protect itself, but this policy choice to supplement common law subrogation doctrines does

---

[20] The builder argues that section 32.065 of the Tax Code governs all contracts for the payment of taxes. In fact, that section's requirements are specifically limited to "contract[s] . . . between a transferee and the property owner under Section 32.06." Tex. Tax Code Ann. § 32.065(b). Thus, section 32.065 only applies to contracts involving statutory lien transfers. Moreover, section 32.065 specifically notes that "Section 32.06 does not abridge the right of an owner of real property to enter into a contract for the payment of taxes." *Id.* § 32.065(a). We therefore reject the builder's argument that all tax payment contracts must comply with section 32.065's requirements.

not indicate an intent to supersede those doctrines. Specifically, the statutes enable tax lien transfers when common law subrogation would not apply if parties satisfy conditions that common law subrogation would not require. At common law, for example, a "mere volunteer" with no prior interest in the property could not obtain equitable subrogation. *Smart*, 597 S.W.2d at 337. Under the statute, anyone can obtain the taxing authority's priority position by meeting the statutory requirements. At common law, the taxpayer's authorization is unnecessary to obtain subrogation. *See id*. at 335, 338 (discussing subrogation where taxpayer did not authorize). Under the statute, it is required. *See* Tex. Tax Code Ann. § 32.06(a-2). At common law (as our next section details), the right to subrogation may depend partially upon equitable considerations, making entitlement to subrogation unpredictable. The statute eliminates this uncertainty. These features make the transfer statutes a useful alternative to traditional subrogation doctrines and demonstrate that the statutes were intended to supplement, rather than eliminate, common law subrogation.

### 2. *Most courts agree that the statutes do not eliminate common law subrogation.*

The Texas Supreme Court has endorsed the view that prior versions of the tax lien transfer statutes did not abrogate common law subrogation. In particular, it refused the writ in a case holding that a lender was equitably subrogated to a tax lien, as well as a case holding that such subrogation was not affected by the transfer statutes. *See Chicago Title Ins. Co. v. Lawrence Invs., Inc.*, 782 S.W.2d 332 (Tex. App.—Fort Worth 1989, writ ref'd) (holding lender was equitably subrogated to tax liens, but not discussing transfer statutes); *McDermott v. Steck Co.*, 138 S.W.2d 1106, 1109 (Tex. Civ. App.—Austin 1940, writ ref'd) ("It is not material whether the bank acquired a lien upon the property under [the tax lien transfer statute]. . . . [A party asserting the bank's interest] was in equity entitled

35

to subrogation to that lien as against a junior incumbrancer . . . .");[21] *see also Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 786 n.6 (Tex. 2007) ("writ refused" cases have same precedential value as Texas Supreme Court opinions). Relying upon one of these cases, *Dotson v. Pahl* also reached the result we do today. 206 S.W.2d 272, 273 (Tex. Civ. App.—Austin 1947, no writ) (parties were "entitled to invoke the doctrine of subrogation, notwithstanding the failure to comply with [the prior version of the tax lien transfer statute]").[22]

Furthermore, in discussing tax-lien subrogation, the Texas Supreme Court has noted that "[e]ven in the absence of statutory or contractual authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law." *Smart*, 597 S.W.2d at 338. Thus, "[u]nder various circumstances [a non-volunteer who satisfies a tax lien] may be subrogated to the taxing authority's lien to the extent necessary for his own equitable protection." *Id.* In reaffirming this equitable entitlement, the court specifically discussed statutory transfer procedures, further demonstrating that these procedures do not abrogate common law subrogation.

In *Genesis Tax*, however, the Texas Supreme Court said of a prior version of section 32.06 "that a tax lien is enforceable only if transferred in accordance with

---

[21] In *McDermott*, the tax collector "transferred" tax liens at the verbal request of a bank, but the transfer statute required written authorization from the party owing the taxes. 138 S.W.2d at 1107. The court held that the effectiveness of this intended transfer "[wa]s not material" because equity required subrogation based upon satisfaction of the tax lien. *Id*. at 1109. Because the court expressly stated that compliance with the statute was not material, the case holds that equitable subrogation may entitle a party to a priority tax lien notwithstanding failure to transfer the lien under statutory procedures. *See id.*

[22] The builder contends that "[the bank] failed to cite *any* case giving a lender first-priority-lien status based upon subrogation to a taxing authority's 'special lien' rights." We disagree. The bank cites *McDermott*, which gave an otherwise junior lienholder the taxing authority's senior priority based upon equitable subrogation. 138 S.W.2d at 1109. *Chicago Title*, although not cited by either party, also equitably subrogated a junior lienholder to the taxing authority's priority position. 782 S.W.2d at 335.

the section's requirements." 339 S.W.3d at 108. The builder contends this quote signals the end of common law subrogation doctrines.

We disagree for two reasons. First, subrogation was not at issue in *Genesis Tax*. The case addressed the effectiveness of a section 32.06 tax lien transfer when the party failed to comply strictly with certain statutory requirements. *See id.* at 109–11. The opinion does not mention subrogation, nor does it cite the subrogation authorities that we analyze above. Thus, read in context, the case's statement that "a tax lien is enforceable only if transferred in accordance with [Section 32.06]" refers only to transfers, not to subrogation. *See id.* at 108–09.

Second, the statutory language that *Genesis Tax* interpreted differs from that at issue here. The statute in *Genesis Tax* provided: "'To be enforceable, a tax lien transferred as provided by this section must be recorded . . . .'" *Id.* at 108 & n.15. The version we now consider alters this language and provides: "A transferee shall record a tax lien transferred as provided by this section . . . ." Tex. Tax Code Ann. § 32.06(d). In this way, while the *Genesis Tax* version arguably conditioned enforceability of tax liens on recordation, the version at issue here clarifies that only *transferees* (as distinguished from subrogees, for example) must comply with statutory recording requirements. The version here also specifically limits the statutory recording requirements to liens transferred "as provided by [Section 32.06]." *Id.*

We have found only one Texas case holding that the tax lien transfer statutes eliminate common law subrogation, and we disagree with its interpretation of the relevant precedents. In *Cameron Life Insurance Co. v. Pactiv Corp.*, the court concluded "there is nothing . . . indicating that [the section giving tax liens superior priority] applies to anyone other than the taxing authorities [and their statutory transferees]." No. 13-05-760-CV, 2007 WL 2388906, at *5 (Tex. App.—Corpus

Christi Aug. 23, 2007, pet. denied) (mem. op.). We disagree because the above-cited cases bind us and directly contradict this conclusion. Indeed, many cases not only "indicate" but directly hold that a party can obtain the taxing authority's lien priority through equitable subrogation.[23]

We also disagree with *Cameron Life*'s analysis of the writ-refused *Chicago Title* case, which granted equitable subrogation to a tax lien. *Cameron Life* dismissed *Chicago Title* by saying "[i]t is unclear . . . what procedure the bank [in *Chicago Title*] used to pay the tax lien." *Id.* The court thus implied that the subrogation rights at issue in *Chicago Title* may, in fact, have been acquired by statutory transfer. *Id.*

But *Chicago Title* does not even mention the transfer statutes and expressly grounds it holding in equitable subrogation. *See* 782 S.W.2d at 332–35. If the subrogated party in *Chicago Title* had actually acquired its lien by statutory transfer, it would have been unnecessary to rely upon—or even discuss—equitable subrogation. *See Genesis Tax*, 339 S.W.3d at 108–11 (not discussing subrogation doctrines where party relied upon statutory transfer). *Chicago Title* did discuss equitable subrogation, however, and its holding rested exclusively upon that doctrine. 782 S.W.2d at 334–35. Thus, we disagree with *Cameron Life*'s conclusion that *Chicago Title* may have actually turned upon statutes not mentioned in the opinion.

\*     \*     \*

For these reasons, we hold that the tax lien transfer statutes do not abrogate common law subrogation doctrines. We note, however, that parties who rely exclusively upon equity to obtain the taxing authority's priority may face

---

[23] In addition to the authorities already cited, see *LaSalle Bank Nat'l Ass'n*, 246 S.W.3d at 620; *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 662 (Tex. 1996).

additional obstacles not present under the statutes.

For example, equitable subrogation is only available to "the extent necessary [for the subrogee's] equitable protection." *Smart*, 597 S.W.2d at 338. "When not compelled by the equities of the situation, full subrogation to all special privileges accompanying the taxing authority's constitutional and statutory lien will be denied." *Id.* This rule limits the extent of subrogated rights.

In addition, as we explain in the next section, subrogation to a tax lien can materially alter the lien's terms and thereby prejudice intervening lienholders. *See Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 520 (Tex. 1969). Here, this prejudice triggers a factual inquiry to resolve the equities. Proceeding by statute avoids the time and expense of determining title in this manner.[24]

**B.  Because subrogation would prejudice the builder, an equitable inquiry is required, and fact questions prevent us from resolving the equities on this record.**

Having concluded that the bank's failure to comply with the transfer statutes does not foreclose common law subrogation, we turn to whether the bank is entitled to the taxing authority's priority here.

As an initial matter, the bank argues that a subrogation provision in its deed of trust entitles it to contractual subrogation as a matter of law and that we cannot examine the equities of subrogation. We disagree because even though the bank and the developer agreed to subrogation under the terms of the deed of trust, the

---

[24] The builder contends that if the tax lien transfer statutes do not eliminate common law subrogation, "these [statutes] would *never* apply." That is, parties will never use statutory procedures when equity may entitle them to the same rights without the statutory hoop-jumping. We doubt this is the case. Compliance with statutory procedures guarantees the lender's ability to enforce the taxing authority's priority lien. Subrogation doctrines guarantee—at best—a shot at this position and high potential for litigation. Notwithstanding the viability of common law subrogation, we believe many lenders will continue to obtain tax liens through statutory transfers.

builder was not a party to that agreement. Our analysis therefore involves equitable considerations as well.

When two parties have a subrogation contract, "equitable considerations that might control . . . in the absence of an agreement" cannot invalidate it. *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 650 (Tex. 2007). This rule works between the parties because "[t]he parties hav[e] fixed their rights by contract" and "additional rights . . . will not be created by judicial intervention." *Smart*, 597 S.W.2d at 338.

This reasoning's force diminishes in cases like this one, however, where enforcing a subrogation contract would alter a nonparty's rights. *See Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp.,* 309 S.W.3d 619, 631 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "In these cases, the right of subrogation is not wholly dependent on the application of a contract." *Id.* Instead, as to the nonparty, subrogation depends partially on equitable principles. *Id*. Thus, "such cases fall into a third, hybrid category." *Id.*

The cornerstone of this equitable analysis is prejudice to the intervening lienholder that is not a party to the subrogation contract. *See Providence Inst. for Sav.*, 441 S.W.2d at 520; *Med Ctr. Bank v. Fleetwood*, 854 S.W.2d 278, 286 (Tex. App.—Austin 1993, writ denied). For example, merely changing the identity of the senior lienholder does not affect the intervening lienholder's rights and therefore is not prejudicial. *Med Ctr. Bank*, 854 S.W.2d at 285–86. Although subrogation may alter who holds the senior lien, the junior lienholder is still junior and still in the same amount. *See id*. Whether subrogation prejudices intervening interests is determined as of the time of the transaction supporting subrogation. *Id.* at 285. The consequences of subsequent transactions or events are not relevant to this inquiry. *Id.*

In many cases, subrogation changes *only* the intervening lienholder's

identity. This change creates no prejudice, so subrogating the intervening lienholder is appropriate as a matter of law. *See, e.g.*, *id.*; *Chase Home Fin., L.L.C.*, 309 S.W.3d at 631–32; *Texas Commerce Bank Nat'l Ass'n v. Liberty Bank*, 540 S.W.2d 554, 556–57 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ); *see also Providence Inst. for Sav.*, 441 S.W.2d at 520. Indeed, one court has stated that "there is no prejudice to intervening interest holders" "absent a showing that subrogation results in [(1)] additional debt having priority over or parity with the intervening interest, [(2)] a material change in the terms of the superior interest, or [(3)] other pecuniary loss resulting from the subrogation."[25] *Med Ctr. Bank*, 854 S.W.2d at 286.

In the absence of prejudice, subrogation must be allowed, but the mere presence of prejudice does not necessarily prevent subrogation. *See Fleetwood v. Med Ctr. Bank*, 786 S.W.2d 550, 555 n.2 (Tex. App.—Austin 1990, writ denied). Rather, "when prejudice exists, the trial court should, in exercising its equitable discretion, consider the totality of the circumstances, of which the existence of prejudice to one or more parties is a part." *Id.* Factors to consider include the extent of prejudice, its foreseeability, and whether the party claiming prejudice could have avoided it. *Id.*

### 1. Subrogation would prejudice the builder by materially changing the terms of the superior interest.

Applying this analysis, we conclude that subrogating the bank to the tax liens would prejudice the builder because it would alter the foreclosure requirements that otherwise apply to tax liens. Statutory and constitutional constraints dictate a tax lien's terms. For example, with the exception of

---

[25] Because we conclude that one of these circumstances exists here, we decline to address whether these are, in fact, the only circumstances that may demonstrate prejudice to an intervening lienholder.

abandoned property, tax liens must be foreclosed judicially rather than by trustee's sale. *See* Tex. Tax Code Ann. § 33.41 (West 2008); *City of Wichita Falls v. ITT Commercial Fin. Corp.*, 827 S.W.2d 6, 10 (Tex. App.—Fort Worth 1992) ("[A]*d valorem* tax liens must be judicially foreclosed . . . ."), *aff'd in part, rev'd in part on other grounds,* 835 S.W.2d 65 (Tex. 1992). Texas Rule of Civil Procedure 39 requires the taxing authority to join any party with an interest in the property in the foreclosure suit. *Murphee Prop. Holdings, Ltd. v. Sunbelt Sav. Ass'n of Texas*, 817 S.W.2d 850, 852 (Tex. App.—Houston [1st Dist.] 1991, no writ); *see also Kothari v. Oyervidez*, 373 S.W.3d 801, 810 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ("[A]t least generally, 'a lienholder must be joined in a delinquent tax suit in order to be bound by it.'"). The Due Process Clause of the United States Constitution also requires that such lienholders receive actual notice of foreclosure. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798–99 (1983). If the foreclosure suit succeeds, all parties to the suit must then receive notice of the foreclosure sale. Tex. Tax Code Ann. § 34.01 (West 2008).

These foreclosure requirements protect intervening lien holders, and the bank's deed of trust eliminated them here. The deed of trust does not require the trustee to notify junior lien holders prior to foreclosure, and the builder had no statutory right to notice. *See Jones v. Bank United of Texas, FSB*, 51 S.W.3d 341, 344 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *Kothari*, 373 S.W.3d at 808–09.

In sum, before subrogation, the tax lien could only be foreclosed through a judicial proceeding requiring the builder as a party, but after subrogation, the bank could foreclose (thereby extinguishing the builder's lien) without even notifying the builder. Indeed, the builder has offered evidence that it had no knowledge that any tax lien existed or that the bank was asserting the taxing authority's priority

position in its foreclosure.

Eliminating protections that existed prior to subrogation constitutes a "material change in the terms of the superior [tax lien]," triggering an equitable inquiry. *See Med Ctr. Bank*, 854 S.W.2d at 286; *cf. First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 416 (Tex. 1993) (where "[b]ank through its 'secret' (as to [junior lienholder]) foreclosure would obtain the title and extra equity" and deprive junior lienholder of his interest, court "would not allow such an inequitable result under the guise of 'equitable' subrogation").

### 2. *Questions of fact regarding the equities of subrogation preclude summary judgment.*

Although summary judgment is available in equitable actions, certain factors counsel against summary dispositions in equitable subrogation cases. *Fleetwood*, 786 S.W.2d at 556–57. For example, the "material facts" in these cases are difficult to define precisely. *Id.* at 556. "The main guiding principle is the prevention of an unfair or unjust result." *Id.* Trial courts have a "measure of discretion" in weighing the circumstances and adjusting the remedy to accomplish this main goal. *See id.* at 555–57 & n.2.

But a trial court does not have unfettered discretion to determine the equities of subrogation. Rather, the right to subrogation must be determined in light of its purpose: preventing unjust enrichment. *See Smart*, 597 S.W.2d at 337. Thus, the principal issue is the extent to which subrogation is necessary to prevent the bank's property tax payments from unjustly enriching the builder. *See id.* at 337–38.

The unresolved factual issues here become clearer when one understands the usual basis for finding unjust enrichment in this type of case.[26] When a junior

---

[26] Equitable subrogation is generally used to avoid unjustly enriching the debtor (here, the developer). *See First Nat'l Bank of Kerrville*, 856 S.W.2d at 415. But as discussed above, the

lienholder satisfies a tax lien to protect its own interest, everyone with an interest in the property benefits as a result. Instead of a tax-lien foreclosure potentially extinguishing all interests, everyone keeps what they have. Subrogating the party who actually satisfies the senior debt places the parties where equity would have them. The junior interest holders who declined to satisfy the lien remain subject to it. The party who paid the senior debt gets what it paid for.

Factual questions regarding whether this reasoning applies here cannot be resolved on this record. The prejudice to the builder if subrogation is allowed, the extent of unjust enrichment to the builder if subrogation is not allowed, and the extent to which subrogation is necessary for the bank's equitable protection all play a role in the analysis as discussed above. For example, whether the builder knowingly allowed the bank to protect the property from any foreclosure, the imminence of a tax foreclosure suit without the bank's intervention, and the developer's potential alternatives to foreclosure may be relevant considerations. *Cf. World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 682 (Tex. App.—Fort Worth 1998, pet. denied) (holding party who purchased vendor's and deed of trust liens knowing taxes were due on property and subsequently paid taxes was not equitably subrogated to tax liens).

Whether the bank intended to be subrogated to the tax lien initially is also relevant. *See Fleetwood*, 786 S.W.2d at 556 (remanding to consider, among other things, whether parties initially intended subrogation). If the bank sought subrogation initially, its reason for not complying with the tax lien transfer statute would be relevant. For example, if the bank intentionally avoided a statutory transfer to surprise the builder, this fact would likely cut against subrogation.

___

equitable balance necessary to determine whether prejudice to an intervening lienholder prevents subrogation focuses upon the would-be subrogee (the bank) and the intervening lienholder (the builder). *See Fleetwood*, 786 S.W.2d at 556–57.

With a more developed record, these and other fact issues that bear on the equities of subrogation can be better addressed. *See id.* at 557 (reversing summary judgment where the "record does not fully develop the facts on which the trial court's equitable discretion must be exercised, and where the facts that are developed, [even if] uncontroverted, can give rise to more than one reasonable inference").[27] For now, "[a]s long as there is a probability that a case has for any reason not been fully developed, [we] ha[ve] the discretion to remand rather than render a decision." *Pena v. Smith,* 321 S.W.3d 755, 759 (Tex. App.—Fort Worth 2010, no pet.); *see also Scott Bader, Inc., v. Sandstone Prod., Inc.,* 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.).[28] Because the bank is not entitled to summary judgment on this record on the ground that it is subrogated to the tax liens, we reverse the remainder of the summary judgment in favor of the bank and remand for further proceedings consistent with this opinion.

## CONCLUSION

For these reasons, there are fact issues regarding the parties' claims that largely preclude summary judgment. We therefore sustain in part the builder's first issue on appeal, in which it argues that the trial court erred in granting

---

[27] On remand, the parties and the trial court should consider which facts material to the equitable analysis are uncontroverted, as well as which are disputed and may need to be found by a jury. *See State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979) ("Although a litigant has the right to a trial by jury in an equitable action, only ultimate issues of fact are submitted for jury determination. The jury does not determine the expediency, necessity, or propriety of equitable relief."). We recognize the possibility that additional discovery may resolve some or all of the fact questions that now prevent summary judgment. This opinion does not prevent the parties from filing future motions for summary judgment, including motions that seek to narrow or resolve the subrogation dispute.

[28] The builder argues it is nevertheless entitled to summary judgment based upon *Conroy Mortgage Corporation v. Fielder*, 375 S.W.2d 344 (Tex. App.—Fort Worth 1964, writ ref'd n.r.e.). We disagree because the equities in *Conroy* were much clearer than those here. The party seeking subrogation in *Conroy* appears to have been a volunteer, and the intervening lienholder had no notice whatsoever of the foreclosure sale that extinguished its interest in the property. Neither of those circumstances are present here.

45

summary judgment for the bank.  Nonetheless, neither the builder nor the bank has established an entitlement to final judgment as a matter of law.  Thus, we overrule the builder's second issue, in which it argues its entitlement to summary judgment.

Specifically, fact issues preclude final summary judgment for either party based upon the builder's mechanic's liens because we cannot determine when the contract was terminated or abandoned and whether the builder's post-release expenses entitle it to mechanic's liens.  The release does establish, however, that the builder was not entitled to re-file a mechanic's lien against Parcel A to secure the unpaid portion of the pre-release debt.  We therefore affirm in part the trial court's grant of summary judgment for the bank, holding that the bank's interest in Parcel A is not subject to the builder's lien for the unpaid pre-release debt.

As to the bank's contention that the tax liens entitle it to summary judgment, fact issues regarding the equities of subrogating the bank to these liens preclude summary judgment on the present record.  We therefore reverse the remainder of the trial court's summary judgment and remand this case for further proceedings consistent with this opinion.[29]

/s/     J. Brett Busby
          Justice

Panel consists of Chief Justice Hedges and Justices Brown and Busby (Hedges, C.J., dissenting).

---

[29] We do not intend this opinion to dictate how the trial court should proceed in addressing the live issues in this case.  The trial court should exercise its discretion to address these issues in the order and manner it deems most appropriate.